KANJUKA, Appellant and Cross–Appellee,

v.

METROHEALTH MEDICAL CENTER, Appellee and Cross–Appellant.

[Cite as *Kanjuka v. MetroHealth Med. Ctr.*, 151 Ohio App.3d 183, 2002-Ohio-6803.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 79995.

Decided Dec. 12, 2002.

184

186

Leonard F. Lybarger, for appellant.

Duvin, Cahn & Hutton, Brett S. Krantz and Jon M. Dileno, for appellee.

ANNE L. KILBANE, Judge.

{¶ 1} This is an appeal from and order of Visiting Judge Robert Lawther that granted appellee and cross-appellant MetroHealth Medical Center's ("Metro-Health's") motion for judgment notwithstanding the verdict ("JNOV") or, in the alternative, motion for a new trial, following a $122,000 jury verdict for appellant and cross-appellee Brigitte Kanjuka on her claims of defamation. She claims that it was error to direct a verdict on her claims of slander per se; JNOV should not have been granted on her claims of defamation per quod; and it was error to take away her verdict. MetroHealth asserts that it should have been granted summary judgment on its assertion of qualified privilege. We reverse and enter judgment for Kanjuka.

{¶ 2} Beginning in 1991, Kanjuka worked as a staff nurse specializing in the care of chemotherapy patients at the MetroHealth Cancer Care Center (the "Center"). In 1997, she was promoted to Practice Coordinator, where she primarily supervised and scheduled staff nurses for the Center and the Infectious Disease Department, in addition to performing clinical duties when needed. Initially, her supervisor was Dr. Susan Carter, the Director of the Center, but, as the department grew and restructured, she reported to Operations Manager Nancy Haas, who reported to Administrator Jeffrey Johnston, who then reported directly to Dr. Carter.

{¶ 3} Beginning in early 1999, Haas began to informally address concerns she had with Kanjuka over the way she scheduled overtime for the nurses and approved vacation days, resulting in staff shortages. Haas also was concerned with Kanjuka's tardiness in completing employee evaluations. In July 1999, she instituted a Performance Improvement Plan for Kanjuka to help identify and address what she saw as deficiencies in her job performance. Against this backdrop, there was an incident in the front lobby of the Center on August 9, 1999, where Haas noticed a staffing shortage and, according to Kanjuka, abusively and publicly berated her in front of patients and others. Haas, hired in 1998, was seen by some of the staff at the Center as overbearing and inappropriately, publicly, and abrasively critical of employees in the presence of patients and their

families. Dr. Carter contended that, overall, there had not been many complaints about her and that she was an exceptional administrator. Because Dr. Carter would not be available until later that day, Kanjuka went to see Johnston to complain about Haas's behavior.

{¶ 4} According to Kanjuka, when she conveyed her concerns about Haas's managerial style, he suggested that perhaps she was unsuited for management and should investigate whether any suitable alternative positions were available through MetroHealth's Human Resource Department. Johnston, however, claimed that Kanjuka resigned her position as Practice Coordinator at this time, and Haas stated that, later that day, Kanjuka told her she was resigning. Kanjuka steadfastly denied ever resigning and, at a meeting with Dr. Carter later that day, was assured that the situation would be taken care of. The following day, however, she was informed by Dr. Carter and Haas that she would have to give them a written resignation for her file. Haas, Dr. Carter, and Kanjuka had separate and collective meetings over the course of the next week that, depending on which of the three women's statements one believes, either resulted in assurances that Kanjuka would remain the Practice Coordinator or reinforced her need to secure another position. Meanwhile, Haas presented Kanjuka with a letter confirming receipt of her oral resignation.

{¶ 5} Because of these events, various employees, including Dr. Edward Mansour, one of the Center's oncologists, sometimes saw Kanjuka crying at the Center. It is undisputed that later in August 1999, Dr. Carter unambiguously told her that it had been decided that she was going to be replaced. Kanjuka was generally well liked by both the physicians for whom she scheduled nurses and the nurses working under her. All who knew her overwhelmingly respected her clinical care-providing skills, cancer-care-related charity work outside the Center, dedication to the Center and ability to relate to, and empathize with, the patients and their families. Consequently, the news that she was leaving the Center caused quite a disruptive buzz. According to MetroHealth, Kanjuka was fueling rumors that she was being "forced out" of the Center by a malicious administration, while the administration seemed to be indicating that she had voluntarily resigned due to acknowledged difficulty in performing the duties of an administrator. Because of all the uncertainty and gossip these events were generating, the environment at the Center became increasingly tense, and Dr. Carter decided, in order to clear the air, to hold a meeting with the physicians, and another with the nurses and other secretarial staff who worked with Kanjuka.

{¶ 6} On August 27, 1999, to explain the reason for her departure, Dr. Carter and Haas met with approximately eleven physicians who regularly interacted with Kanjuka and explained that her resignation resulted from performance deficiencies. The meeting was heated; some of the physicians disputed the

validity of the statement and accused Dr. Carter or Haas of forcing Kanjuka to leave. Dr. Mostafa Salim claimed that Dr. Carter indicated that part of the source of Kanjuka's difficulties was "a psychiatric problem" or "depression."

{¶ 7} On August 30, 1999, Dr. Carter met with thirteen to fifteen nurses and other nonphysician personnel and claimed that she told the group only that Kanjuka had resigned, that she was very "sad" or "depressed," and that they should help her through this difficult transitional period. However, according to nurses Diane Wolf, Barbara Ruda, and Susan Harwood, Dr. Carter had spoken of Kanjuka's "depression" or told them that she was "very depressed." In addition, all three attributed statements by Dr. Carter to the effect that Kanjuka was either having problems coming to work on time or "found it hard to get up in the morning and come to work, and that had to stop." All three contended that each understood these comments to mean that Kanjuka was suffering from a mental illness.

{¶ 8} Following these meetings, Kanjuka stated that Juliana Matts and Tyler Tribec, staff members that she neither knew very well nor often talked with, approached her to console her about her "condition," or tell her how "brave" she was being. She transferred as a staff nurse to another MetroHealth department and contended that her new co-workers were not friendly and made her uncomfortable by their aloofness.

{¶ 9} Kanjuka filed suit against MetroHealth and Dr. Carter, alleging slander per se, slander per quod, and invasion of privacy. Judge Shirley Strickland Saffold, originally assigned to the case, granted the MetroHealth and Dr. Carter's joint motion for summary judgment on her invasion of privacy claim, but denied their motion for summary judgment on defamation claims and further ruled that neither could utilize the "qualified privilege doctrine" as a defense to slander. Kanjuka settled her claims against Dr. Carter, and the trial against only MetroHealth was reassigned to the visiting judge.

{¶ 10} Before trial commenced the judge stated that, while he felt that a "qualified privilege" defense should be available to MetroHealth, he felt constrained to exclude it because of Judge Saffold's earlier ruling. At the close of Kanjuka's case-in-chief, he granted MetroHealth a directed verdict on any claims rooted in defamation per se, and the jury, at the conclusion of trial, awarded Kanjuka $122,000 in compensatory damages on her defamation per quod claims. Through interrogatory answers, the jury explicitly found that the statements it found to be defamatory related to Kanjuka's "depression" and "tardiness." The judge then granted MetroHealth's post-trial motion for JNOV, or in the alterna-

tive, a new trial, and these cross-appeals follow.[1]

{¶ 11} Kanjuka's assignments of error state:

{¶ 12} "I. The trial court erred in granting defendant a directed verdict regarding plaintiff's claim of slander per se."

{¶ 13} "II. The trial court erred in granting defendant MetroHealth Medical Center judgment notwithstanding the verdict with respect to appellant's claim of defamation per quod."

{¶ 14} Under Civ.R. 50(A)(4), a court may properly grant a motion for directed verdict when, after construing the evidence most strongly in favor of the party against whom the motion is directed, it finds that reasonable minds could come to but one conclusion on a determinative issue, and the conclusion is adverse to the nonmoving party.[2] Review of the grant or denial of a motion for directed verdict is de novo.[3] In evaluating the grant or denial of a JNOV, a reviewing court applies the same test as that applied in reviewing a motion for a directed verdict.[4]

{¶ 15} Defamation is a false publication that injures a person's reputation, exposes him to public hatred, contempt, ridicule, shame, or disgrace, or affects him adversely in his trade or business.[5] The essential elements of a defamation action are a false statement, that the false statement was defamatory, that the false defamatory statement was published, the plaintiff was injured, and the defendant acted with the required degree of fault.[6] There are two forms of defamation: libel or slander. Generally, slander refers to spoken defamatory words and libel refers to written defamatory words.[7]

{¶ 16} "Defamation may be per se or per quod. Defamation *per se* means that the defamation 'is accomplished by the very words spoken.' *McCartney [v. Oblates of St. Francis deSales* (1992), 80 Ohio App.3d 345] at 353, 609 N.E.2d 216. Defamation *per quod* means that a statement with an apparently innocent meaning becomes defamatory through interpretation or innuendo. *Id.* In order for a statement to be defamatory *per se*, it must 'consist of words which import an indictable criminal offense involving moral turpitude or infamous

---

1. Kanjuka originally assigned, as her fifth assignment of error, that Judge Saffold had wrongly granted summary judgment to the defendants on her invasion-of-privacy claim. She has since withdrawn that assignment from consideration.

2. See Civ.R. 50(A)(4).

3. *Grau v. Kleinschmidt* (1987), 31 Ohio St.3d 84, 90, 31 OBR 250, 509 N.E.2d 399; *Steppe v. Kmart Stores* (1999), 136 Ohio App.3d 454, 737 N.E.2d 58.

4. *Pariseau v. Wedge Products, Inc.* (1988), 36 Ohio St.3d 124, 127, 522 N.E.2d 511.

5. *Matalka v. Lagemann* (1985), 21 Ohio App.3d 134, 136, 21 OBR 143, 486 N.E.2d 1220.

6. *Celebrezze v. Dayton Newspapers, Inc.* (1988), 41 Ohio App.3d 343, 346, 535 N.E.2d 755.

7. *Retterer v. Whirlpool Corp.* (1996), 111 Ohio App.3d 847, 857, 677 N.E.2d 417.

punishment, imputes some loathsome or contagious disease which excludes one from society or tends to injure one in his trade or occupation.' *Id.* With defamation *per se,* damages and actual malice are presumed. With defamation *per quod,* the plaintiff must plead and prove special damages resulting from the defamatory statements."[8]

{¶ 17} Here the judge ruled that the statements allegedly made by Dr. Carter surrounding Kanjuka's depression and tardiness were not slanderous per se and rendered a directed verdict on any such defamation claim. The testimony elicited at trial about Dr. Carter's statement regarding Kanjuka's depression and ability to get to work on time, or difficulty in getting up to go to work, however, bore directly on her ability to successfully fulfill her professional responsibilities. An allegation that one has acted unprofessionally constitutes defamation per se.[9] Dr. Carter specifically testified that tardiness was not an issue addressed in Kanjuka's Performance Improvement Plan, and that it was not an issue at the time she addressed the nonphysician staff regarding Kanjuka's reasons for leaving the Center. Therefore, the judge should not have directed a verdict on Kanjuka's defamation per se claims stemming from Dr. Carter's alleged statements on the grounds that no evidence of defamation per se was presented.

{¶ 18} It is true, however, that MetroHealth elicited testimony from Dr. Ingeborg Hrabowy, Kanjuka's therapist, that, prior to August 9, 1999, when she first either resigned or was notified of the need to change jobs, Kanjuka suffered from symptoms of depression, as a component of an adjustment disorder with mixed features of anxiety and depression. Therefore, Dr. Carter's statements reflecting the bare existence of depression or the fact that Kanjuka was "depressed" cannot be asserted as defamation per se, as "truth" presents a defense to defamation claims.[10]

{¶ 19} Defamation per quod, however, is defamation arising through the operation of an inference or innuendo, and, within the context of the meetings Dr. Carter held to explain Kanjuka's purported resignation, it is reasonable for the jury, or anyone hearing the statements upon publication, to have concluded, through innuendo, that Dr. Carter may have falsely intimated that Kanjuka resigned *due to* the attributed depression. Such an interpretation would certainly open one so defamed to loss of professional reputation, mental anguish, or embarrassment. This conclusion is strengthened by the reactions of those who

---

8. *Darby v. Ciraso* (Sept. 19, 2000), Scioto App. No. 99CA2657.

9. *Gosden v. Louis* (1996), 116 Ohio App.3d 195, 207, 687 N.E.2d 481. See, also, *Becker v. Toulmin* (1956), 165 Ohio St. 549, 553, 138 N.E.2d 391.

10. *Krems v. Univ. Hosp. of Cleveland* (1999), 133 Ohio App.3d 6, 726 N.E.2d 1016.

either heard or heard of the statements. Nurses Wood, Ruda, and Harmon testified that after the whole of the meeting they assumed that Kanjuka, who under any normal circumstance devoted her everything to her job, was mentally ill. The obvious inference presented by the statement regarding depression, in the context of Kanjuka's resignation, is that the two circumstances were related.

{¶ 20} Accordingly, the jury could have found actionable defamation per quod in the statements regarding depression or tardiness if they attributed Kanjuka's alleged resignation, or tardiness or difficulty coming to work, to her depression, and they also believed that, according to the evidence before them, Kanjuka never resigned her position. Therefore, while the judge correctly noted that truth presents a defense to defamation claims, and the "innocent construction rule" bars recovery for a statement susceptible of two meanings, one innocent and one potentially defamatory,[11] such that a claim of defamation per se would not be actionable, he erred in granting MetroHealth's motion for JNOV on Kanjuka's defamation per quod claims arising from Dr. Carter's comments about her alleged depression. Given the context of the statements, which must be evaluated in determining whether defamation arises from a given statement, the judge erred in concluding that a reasonably innocent meaning could be given to Dr. Carter's statements regarding Kanjuka's depression and tardiness, which the jury could have reasonably found to be a fabrication, as an explanation for her resignation.

{¶ 21} The first assignment of error is not well taken, but the second has merit.

{¶ 22} "III. The trial court erred in not allowing into evidence defendant MetroHealth Medical Center's policy governing confidentiality."

{¶ 23} Kanjuka argues that the judge foreclosed testimony about the internal MetroHealth confidentiality policy which forbids employees to disclose personal medical information about patients, including patients who were also employees.

{¶ 24} A decision to exclude evidence is not grounds for reversal unless the record clearly demonstrates that the judge abused his discretion in so ruling and that the complaining party has suffered a material prejudice.[12] An abuse of discretion implies that the judge's attitude was unreasonable, arbitrary, or unconscionable.[13]

---

11. *Mendise v. Plain Dealer Publishing Co.* (1990), 69 Ohio App.3d 721, 591 N.E.2d 789.

12. *Columbus v. Taylor* (1988), 39 Ohio St.3d 162, 164, 529 N.E.2d 1382.

13. *Tracy v. Merrell Dow Pharmaceuticals, Inc.* (1991), 58 Ohio St.3d 147, 152, 569 N.E.2d 875.

{¶ 25} Since we find that Kanjuka has satisfied her burden of proof of establishing actual malice by clear and convincing evidence,[14] we conclude that excluding evidence which would tend to show Dr. Carter's potential violation of MetroHealth's confidentiality policy did not work to Kanjuka's prejudice. In addition, it was argued neither at trial nor here that Dr. Carter's alleged confidentially breach gave rise to a cause of action. This case was correctly decided by the jury upon legal defamation principles only. This assignment of error is not well taken.

{¶ 26} "IV. The trial court erred in granting defendant MetroHealth Medical Center, in the alternative to a judgment notwithstanding the verdict, a new trial."

{¶ 27} The judge granted MetroHealth a new trial as an alternative to a JNOV because he found, under the requirements of Civ.R. 59, that excessive damages appeared to have been given under the influence of passion or prejudice, the decision was against the weight of the evidence, and the verdict was contrary to law.

{¶ 28} The decision to grant a new trial lies within the sound discretion of the judge.[15] Motions for a new trial premised on the weight of the evidence should be overruled where the judgment is supported by some competent, credible evidence going to each essential element of the case.[16]

{¶ 29} The judge ruled that Kanjuka presented no evidence that anyone believed any statement Dr. Carter made, even assuming it to be defamatory, and so she sustained no damage to her professional reputation. He also ruled that the trial was tainted by Kanjuka's introduction of much evidence tending to show that she was badly treated and unfairly forced to leave her position as Practice Coordinator, which was irrelevant to a determination of whether she had been defamed. The judge theorized that because the jury may have been moved to sympathize with Kanjuka because of the shabby treatment she claimed to receive from her superiors at the Center, the verdict and damage amount were a product of passion and prejudice.

{¶ 30} Damages for defamation, however, may include impairment of reputation, personal humiliation, shame, mental anguish, and suffering.[17] *In*

14. See our discussion of MetroHealth's second cross-assignment of error, ¶ 43, below.

15. *Verbon v. Pennese* (1982), 7 Ohio App.3d 182, 7 OBR 229, 454 N.E.2d 976.

16. · *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

17. *Rogers v. Buckel* (1992), 83 Ohio App.3d 653, 659, 615 N.E.2d 669; *Thomas H. Maloney & Sons, Inc. v. E.W. Scripps Co.* (1974), 43 Ohio App.2d 105, 110, 72 O.O.2d 313, 334 N.E.2d 494.

*Lansdowne v. Beacon Journal Publishing Co.,*[18] the Ohio Supreme Court held that actual harm can result from injury to reputation and personal humiliation:

{¶ 31} "As a subsidiary issue, appellants contend that a heightened standard is required for proof of actual harm inflicted by defamatory falsehood. * * * Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury. * * *"[19]

 {¶ 32} Also contrary to the judge's ruling in granting the motion for JNOV or a new trial, or in the issuance of the jury instructions in this case, which neither party has raised as an issue on appeal, a defamatory statement does not have to be necessarily believed by one hearing it in order to create liability on the part of its publisher. In *Hahn v. Kotten,*[20] the Supreme Court of Ohio delineated what a party must prove to establish a prima facie case of defamation as follows:

{¶ 33} "In an action for defamation, the plaintiff's prima facie case is made out when he has established a publication to a third person for which defendant is responsible, the recipient's understanding of the defamatory meaning, and its actionable character. * * *"

{¶ 34} In this case, three nurses all testified that they understood Dr. Carter's comments to mean that Kanjuka was suffering from a mental illness, and Dr. Salim testified that Dr. Carter may have actually used the words "psychiatric problem" to describe her condition. While belief in a defamatory statement may affect one in his occupation through refusal of employment, causing damages to the person's reputation, mental anguish and humiliation are not secondary sources of damage for a defamation claim, cognizable only after harm to personal reputation is established. In any event, Kanjuka testified that two persons actually approached her to somehow console her for reasons she could not determine, but later came to realize that they may have been acting pursuant to the statements Dr. Carter made concerning her being "depressed." Therefore, even if "belief" was required in order to sustain a defamation action, Kanjuka presented at least circumstantial evidence to support a verdict in her favor.

---

18. (1987), 32 Ohio St.3d 176, 512 N.E.2d 979.

19. Id. at 181, 512 N.E.2d 979.

20. (1975), 43 Ohio St.2d 237, 243, 72 O.O.2d 134, 331 N.E.2d 713.

{¶ 35} As far as actual damages proven is concerned, Kanjuka presented the testimony of Dr. Hrabowy, who stated that she has suffered much mental anguish from the combined forces of losing her position at the Center and knowledge of the statements of Dr. Carter. She testified that it would take at least two years of sustained therapy to treat Kanjuka's psychological injury, which had progressed to resemble post-traumatic stress disorder more than adjustment disorder. Kanjuka and her sisters, Elizabeth and Marielle, testified about the negative change in her energy level, activity, and overall happiness since August 1999. Consequently, she appropriately asked the jury to return to her as damages a percentage of the total amount of overall happiness she lost through these events, quantified as a dollar figure based on assigning a daily value to Kanjuka's state of mind.

{¶ 36} Finally, while the parties did often stray from the path of relevance in this case and, at trial, discussed more irrelevant wrongful-discharge-oriented evidence than they perhaps should have, the judge, more than once, reminded the jury of the singularly defamation-oriented issues to be decided in the case before it. Thus, the verdict was not the result of the jury's passion or prejudice and should have been allowed to stand.

{¶ 37} Because sufficient evidence existed in order to establish each element of the tort of defamation per quod, including understanding of the defamatory statements as defamatory statements by those who heard them, and damages, the judge should not have ordered a new trial on these grounds.

{¶ 38} "Cross–Assignment I: Summary judgment should have been granted on cross-appellant MetroHealth Medical Center's motion for summary judgment on cross-appellee Brigitte Kanjuka's defamation claim, as the assigned judge erred in ruling that the qualified privilege was not applicable to statements made at two small meetings of employees who worked with Ms. Kanjuka."

{¶ 39} MetroHealth contends that its motion for summary judgment should have been granted because of deficiencies in Kanjuka's brief in opposition and objects to Kanjuka's citing of trial testimony in opposition to this assignment. However, any error by a trial judge in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made.[21] As we conclude that Kanjuka did present sufficient evidence to justify a verdict in her favor, there is no reversible error in Judge Saffold's denial of MetroHealth's

21. *Continental Ins. Co. v. Whittington* (1994), 71 Ohio St.3d 150, 642 N.E.2d 615, syllabus.

motion for summary judgment, even if, prior to trial, it should have been granted. Therefore, this assignment of error is without merit.

{¶ 40} "II. Even absent summary judgment, MetroHealth should have been permitted to present the defense of qualified privilege at trial as the assigned judge erred, in ruling on MetroHealth's 'Motion for Reconsideration or Clarification Regarding Qualified Privilege,' that the qualified privilege could not apply as a matter of law, an error which was acknowledged at trial but not remedied by the trial judge, thereby precluding MetroHealth's presentation of a qualified privilege defense."

{¶ 41} Prior to trial, Judge Saffold ruled that qualified privilege would not be available to MetroHealth as a defense to Kanjuka's complaint because Dr. Carter's statements clearly exceeded the scope of the information she needed to supply to Kanjuka's co-workers regarding the circumstances of her departure, and that they were not presented at a meeting as a matter of "routine." Judge Lawther, while disagreeing with this ruling, stated on the record that he felt constrained to apply Judge Saffold's pretrial ruling on the matter by informal directive of the "Presiding Judge" of the court. However, in granting a new trial, he ruled that the prior ruling was clear error and justified the grant of a new trial.

{¶ 42} Generally, a communication made in good faith on a matter of common interest between an employer and an employee, or between two employees concerning a third employee, is protected by qualified privilege.[22] The elements necessary to establish the privilege are " ' * * * good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only.' " (Emphasis omitted.)[23] Once a defendant demonstrates the existence of the qualified privilege, a plaintiff can prevail only upon a showing of actual malice.[24] Actual malice in defamation cases may be demonstrated only by clear and convincing evidence that the defendant published the statement at issue "with knowledge that it was false or with reckless disregard for its truth or falsity."[25]

{¶ 43} The end effect of a qualified privilege defense is to heighten the standard of proof of fault required of a plaintiff alleging defamation to the level of

---

22. See, e.g., *Evely v. Carlon Co.* (1983), 4 Ohio St.3d 163, 165–166, 4 OBR 404, 447 N.E.2d 1290; *Stearns v. Ohio Sav. Assn.* (1984), 15 Ohio App.3d 18, 20, 15 OBR 39, 472 N.E.2d 372.

23. *Hahn v. Kotten* (1975), 43 Ohio St.2d 237, 244, 72 O.O.2d 134, 331 N.E.2d 713.

24. *Evely*, supra, 4 Ohio St.3d at 166, 4 OBR 404, 447 N.E.2d 1290.

25. *Jacobs v. Frank* (1991), 60 Ohio St.3d 111, 115, 573 N.E.2d 609.

actual malice. In this case, the jury found by special interrogatories that Kanjuka had demonstrated that Dr. Carter published false and defamatory statements concerning her depression and tardiness, and found, by clear and convincing evidence, that Dr. Carter "failed to act reasonably in attempting to discover the truth or falsity or defamatory character of any false statements which were believed and which caused actual injury to [Kanjuka]'s reputation," which we find is supported by the record. Dr. Carter testified that Kanjuka, so far as she knew, was not suffering from clinical depression and had no timeliness issues, at the time she allegedly made the statements. Therefore, assuming that the jury would have found that Dr. Carter had a qualified privilege to make the remarks that the jury found to be defamatory, MetroHealth had the benefit of the high "actual malice" standard of proof, even without an instruction as to qualified privilege, and we find any error in the failure to instruct the jury as to the privilege to be harmless. This assignment of error is not well taken.

Judgment reversed
and jury verdict reinstated.

JAMES J. SWEENEY, J., concurs.

TERRENCE O'DONNELL, J., dissents.

TERRENCE O'DONNELL, Judge, dissenting.

{¶ 44} I respectfully dissent.

{¶ 45} Following trial on the limited issue of whether statements made by Dr. Susan Carter, the former Medical Director of the Cancer Care Center at MetroHealth Medical Center, defamed Brigitte Kanjuka, a former practice coordinator who worked there, the jury returned a verdict for Kanjuka, answered interrogatories indicating that the defamatory statements were "depression" and "tardiness," and awarded her compensatory damages in the amount of $122,000 for those statements. MetroHealth moved for judgment notwithstanding the verdict, or, in the alternative, new trial or remittitur, contending, inter alia, that Kanjuka failed to present evidence that the alleged defamatory statements lowered the community's estimation of her or deterred others from associating with her, and arguing that Kanjuka did not establish a causal connection between Carter's statements and comments made to her by staff, and that no inference could be made that the hearsay staff comments established injury to her reputation.

{¶ 46} The trial court conducted a hearing on the motion and prepared a ten-page journal entry and opinion in which it stated:

{¶ 47} "Plaintiff is [sic] this case failed to produce any witness who believed that she was depressed or had been tardy. * * *

{¶ 48} "* * *

{¶ 49} "To justify any monetary verdict in this case, Plaintiff must have proven a compensable injury. There was no evidence as to monetary damages, and all the evidence produced by Plaintiff supported her claim that she was a wonderful worker, well liked by her peers in the Cancer Center, and highly regarded by everyone who attended either of the two meetings held by Dr. Carter. * * *"

{¶ 50} The trial court concluded therefore that even if Dr. Carter's statements did defame Kanjuka, no one allowed them to influence his or her relationship with Kanjuka or acted differently toward her because of them. For that reason, the court granted the judgment notwithstanding the verdict.

{¶ 51} Civ.R. 50 provides for the granting of a motion for judgment notwithstanding the verdict. Specifically, subsection (C)(1) provides:

{¶ 52} "(1) If the motion for judgment notwithstanding the verdict, provided for in subdivision (B) of this rule, is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment. In case the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered. In case the motion for a new trial has been conditionally denied, the appellee on appeal may assert error in that denial; and if the judgment is reversed on appeal, subsequent proceedings shall be in accordance with the order of the appellate court."

{¶ 53} Thus, the procedure followed by the sage trial judge parallels the rule.

{¶ 54} The trial court then made the following statement in its opinion:

{¶ 55} "If the reviewing Court does not affirm the JNOV granted by this court, then Defendant is in the alternative clearly entitled to a new trial."

{¶ 56} Civ.R. 59(A) provides:

{¶ 57} "A new trial may be granted * * * upon any of the following grounds:

{¶ 58} "* * *

{¶ 59} "(4) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice;

{¶ 60} "* * *

{¶ 61} "(6) the judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case;

{¶ 62} "(7) The judgment is contrary to law;

{¶ 63} "* * *."

{¶ 64} Here, the trial court exercised discretion in considering its ruling on the post-trial motion.

{¶ 65} Citing Civ.R. 59(A)(4), (6), and (7), the court concluded that the $122,000 judgment is not sustained by the weight of the evidence:

{¶ 66} "[T]he Plaintiff was not defamed, no one believed the statements allegedly made, and no damages were sustained as required by law."

{¶ 67} The court granted the new trial in part because it determined the judgment to be contrary to law. Civ.R. 59(A)(7). In this regard, the court stated:

{¶ 68} "This court received the case as a 'spin off' and under orders from our Presiding Judge is not permitted to change a ruling by the original judge (unless such ruling was interlocutory). It was this court's belief that the defense of qualified privilege raised a jury question, but was without authority to permit defendant to raise the issue in trial.

{¶ 69} "As a result, a substantial error of law was made preventing Defendant from receiving a fair trial. This error alone is sufficient to fully justify a new trial."

{¶ 70} In addition, the trial court premised its new trial order on its finding:

{¶ 71} "[T]he verdict was excessive and given under the influence of passion and prejudice. In view of the failure of Plaintiff to prove actual damages, monetary or otherwise, a verdict of $122,000 can be attributed only to passion, prejudice, and a total failure to understand the facts of the case. * * *" Civ.R. 59(A)(4).

{¶ 72} While the majority suggests that the jury may have made inferences to support its verdict, it is immediately obvious that no evidence exists as a basis from which to make an inference. The trial court reiterated that Kanjuka did not present evidence as to monetary damages.

{¶ 73} Independent of that argument, however, in my view is the overriding factor of a lack of fundamental fairness in denying MetroHealth the opportunity to present evidence of its defense of qualified privilege. Without question, as articulated in the trial court opinion as cited here, MetroHealth may have prevailed on its defense if allowed the opportunity to present evidence at trial.

{¶ 74} Further, the trial court found the verdict excessive and "given under the influence of passion and prejudice." During final argument, the trial court noted in its opinion, counsel referred to Kanjuka's "job loss," valued gross injury

at $491,000, and subtracted $368,250 from that amount to arrive at defamation damages of $122,750. As the trial court noted, Kanjuka is still employed as a registered nurse at MetroHealth, and, therefore, this is not a wrongful-discharge case.

{¶ 75} Finally, the court found that the damages award "was manifestly against the weight of the evidence."

{¶ 76} The decision of whether to grant a motion for judgment notwithstanding the verdict or a new trial is one vested in the sound discretion of the trial court. See *Highfield v. Liberty Christian Academy* (1987), 34 Ohio App.3d 311, 518 N.E.2d 592.

{¶ 77} Here, the careful trial judge articulated reasons for the court's decision as required by *Winson v. Fauth* (1989), 63 Ohio App.3d 738, 580 N.E.2d 44.

{¶ 78} Our duty, as set forth in *Dillon v. Bundy* (1991), 72 Ohio App.3d 767, 596 N.E.2d 500, in assessing whether the trial court abused its discretion in granting a new trial on the basis of excessive damages is to consider whether the jury heard improper argument of counsel or whether other conduct could have influenced the jury. In this case, not only did counsel use an improper measure of damages in final argument as outlined by the trial court, but also MetroHealth had no opportunity to present one of its defenses at trial. This is not a basis to conclude that the court abused its discretion.

{¶ 79} Regarding MetroHealth's contention that the verdict is not sustained by the weight of the evidence, the court found no proper evidence of defamatory damages established by Kanjuka, and it exercised its discretion to grant a new trial in part on that basis.

{¶ 80} After a careful review of the record, the court's opinion, and the bases of its ruling in connection with the evidence presented at trial, I do not agree that the trial court abused its discretion in granting judgment notwithstanding the verdict or in the alternative exercise of its discretion pursuant to Civ.R. 50(C) to alternatively conditionally grant the motion for new trial. Accordingly, I would affirm the judgment of the court, and for that reason, I dissent.