JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Plaintiffs-appellants Robert A. Eastman, Administrator/Executor of the Estate of Barbara J. Eastman, Robert Eastman, individually, James Robert Eastman, and Janet Eastman Rose (collectively "appellants" or "the Estate"), appeal from the jury verdict rendering judgment in favor of defendants-appellees Fred S. Hirsh, M.D. and Fred S. Hirsh, M.D., Inc. (collectively "appellees" or "Dr. Hirsh"). For the reasons that follow, we affirm.
 {¶ 2} The Estate filed this medical malpractice and wrongful death action in April 2005. The Estate also brought a survivorship claim on decedent Barbara J. Eastman's behalf in regard to the last months of her life. After discovery, the case proceeded to a jury trial.
 {¶ 3} At the close of the evidence, the court granted a directed verdict in favor of appellees on the survivorship claim. The jury returned a unanimous verdict for appellees on the medical malpractice and wrongful death claims. The Estate filed a motion for a new trial and/or judgment notwithstanding the verdict, which was denied.
 {¶ 4} The record before us demonstrates that Ms. Eastman was 65 years of age when she died in April 2004. At the time of her death, she was suffering from metastasized vulvar cancer. Ms. Eastman was also suffering from squamous cell carcinoma of the lung and renal failure. *Page 4 
 {¶ 5} Ms. Eastman was first diagnosed in 1998 with vulvar cancer by Dr. Hirsh, a dermatologist. The cancer was on her right labia, she was treated, and it was resolved. Ms. Eastman continued to treat with Dr. Hirsh for other dermatological needs, including for a condition known as lichen sclerosus et atrophicus ("lichen sclerosus"). Lichen sclerosus is an extremely painful condition and causes extreme irritation of the skin, most commonly in the vaginal area, often leading to itching and scratching.
 {¶ 6} On August 29, 2001, Ms. Eastman saw Dr. Hirsh, and he noted a 1.1 centimeter ulceration on her left labia. He prescribed various courses of treatments with antibiotics, anti-inflammatory drugs, anti-fungal drugs, and steroids, until May 14, 2002. On May 14, when the ulceration was 1.7 centimeters, Dr. Hirsh did a biopsy and discovered that it was cancerous. The Estate's contention was that Dr. Hirsh should have completed a biopsy on August 29, when he first noted the ulceration, and his failure to do so was medical malpractice and led to Ms. Eastman's wrongful death.
DR. HIRSH'S TESTIMONY
 {¶ 7} At trial, Dr. Hirsh explained that the itching and scratching caused by lichen sclerosus also causes marked thinning and weakening of the skin of the affected area, making it susceptible to irritation and greater itching and scratching. Dr. Hirsh further explained that because of the nature of the condition, erosions, lesions, and ulcerations of the affected area are very common. *Page 5 
 {¶ 8} Dr. Hirsh also testified that although there is no cure for lichen sclerosus, drugs containing anti-fungal, anti-bacterial, anti-inflammatories, and steroids are commonly prescribed for the condition to partially relieve the symptoms. The treatment, however, often leads to further thinning of the affected skin, thus potentially aggravating future symptoms.
 {¶ 9} Dr. Hirsh testified that prior to Ms. Eastman's visit in August 2001, she self-treated with sitz baths, a hair dryer, and an anti-inflammatory cream. He prescribed her topical anti-bacterial, anti-fungal, and anti-inflammatory medications for the ulceration and told her to return in three weeks if the condition did not resolve. Dr. Hirsh's notes from that visit indicated that Ms. Eastman's self-treatment, especially with the hair dryer, could have seriously aggravated the affected area. Ms. Eastman never scheduled a three-week follow-up visit.
 {¶ 10} Dr. Hirsh did not see Ms. Eastman again until January 2002. Specifically, on January 4, Ms. Eastman saw Dr. Hirsh to get treatment for a rash that had developed as the result of medication she took for an unrelated condition. During that visit, Dr. Hirsh noted that Ms. Eastman's left-side ulceration had resolved with her use of the topical agents he had prescribed. Dr. Hirsh testified that if the ulceration had been cancerous, the topical agents would not have cured it.
 {¶ 11} Ms. Eastman saw Dr. Hirsh again on January 21 for treatment of a rash and cracking of her fingers. Dr. Hirsh also examined her vulvar region during that visit and noted new "vaginal areas ulceration infection." He prescribed anti-fungal, *Page 6 
anti-bacterial, and anti-inflammatory medications, and followed-up with Ms. Eastman three days later, on January 24. At the follow-up visit, Dr. Hirsh determined that "[t]here was no ulceration. It was already getting better." Dr. Hirsh saw Ms. Eastman again on February 5, 2002, at which time he noted that there was improvement to the affected area and that no ulceration was present.
 {¶ 12} Ms. Eastman cancelled a March 2002 appointment with Dr. Hirsh. She saw him again on April 4, at which time Dr. Hirsh noted two new ulcers on the left side of her vulva. One of the ulcers was already almost re-epithelialized, which means that it was healing itself. The other ulcer was 1.7 centimeters in size. Dr. Hirsh prescribed an antibiotic for the ulcer and he and Ms. Eastman agreed that he would monitor how it was doing with the antibiotic.
 {¶ 13} In accordance with Dr. Hirsh's follow-up instructions, Ms. Eastman saw him again on May 14. At that time, Dr. Hirsh saw that the ulcer he noted on April 4 was still present, and performed a biopsy on it. The biopsy came back positive for squamous cell carcinoma. The ulcer was 2.6 centimeters. The last time Dr. Hirsh saw Ms. Eastman was on May 21, when he referred her for treatment.
THE ESTATE'S EXPERT
 {¶ 14} Dr. Larry Copeland, an obstetrician, gynecologist, and gynecological oncologist, testified on behalf of the Estate at trial. According to Dr. Copeland, based on Ms. Eastman's prior cancer, a biopsy of the ulceration needed to be performed on August 29, or shortly thereafter, and if one had been done, Ms. *Page 7 
Eastman's cancer probably would have been a Stage I cancer, rather than the Stage III cancer that it was.
 {¶ 15} Dr. Copeland explained that even with Ms. Eastman's lichen sclerosus, a biopsy should have been performed earlier than it was done. Dr. Copeland admitted that because lichen sclerosus is a chronic condition, repetitive biopsies should not be performed, but, rather, any abnormalities or ulcers could be treated with antibiotics or steroids. Dr. Copeland testified, however, that Ms. Eastman's prior cancer made her different and a biopsy as soon as the ulcer was discovered would have been the appropriate protocol.
 {¶ 16} DR. HIRSH'S EXPERTS
 {¶ 17} Dr. Robert Edwards, a gynecologist, obstetrician, and gynecological oncologist, testified for the defense at trial. Dr. Edwards explained that Ms. Eastman's cancer was "rapidly growing" and "exceedingly aggressive." Dr. Edwards testified that if the ulcer Dr. Hirsh saw in August 2001 was the same cancerous tumor Dr. Hirsh diagnosed in May 2002, it would have been six to seven centimeters by the time it was removed, rather than the 2.6 centimeters that it actually was. Dr. Edwards also testified hypothetically that, based on a reasonable medical probability, if a cancerous ulceration existed in January 2002, a biopsy would not have made any difference. In so testifying, however, Dr. Edwards disputed that a cancerous ulceration existed in January 2002. *Page 8 
 {¶ 18} Dr. Edwards further testified that he did not believe a biopsy should have been performed earlier on Ms. Eastman. He cited the following as reasons why an earlier biopsy would not have been advisable: 1) lichen sclerosus causes "paper thin skin," and the ability of the skin to heal after a biopsy is extremely limited; 2) Ms. Eastman already suffered from chronic urinary incontinence and 3) a biopsy could have led to celluitis and/or chronic infections.
 {¶ 19} Dr. Edwards also testified that Ms. Eastman's medical records did not show that there existed a "persistent" ulcer in the same site from August 2001 until the time of the biopsy in May 2002. In fact, the initial ulcer had resolved.
 {¶ 20} The defense also presented the testimony of Dr. Robert Brodell, a dermatologist and dermopathologist. Dr. Brodell testified that the lesion Ms. Eastman had in 1998 was markedly different from the ulceration she had in August 2001, and that the 1998 lesion required a biopsy. Dr. Brodell further testified that the topical agents she used beginning in August 2001 would not have provided any relief for her if she had had a malignant tumor at that time.
 {¶ 21} Dr. Brodell also testified that Dr. Hirsh's decision not to biopsy Ms. Eastman was correct for several reasons, including the following: 1) the medical records indicated that Ms. Eastman did not have an ulceration on her left vulva on January 2, 2002; 2) the two ulcerations noted on Ms. Eastman's left vulva would not have been present prior to January or August; 3) the ulceration noted in August 2001 was not present on January 2, 2002, and there was no ulceration present on January *Page 9 
4, 2002; 4) patients with lichen sclerosus experience hundreds of lesions of the vulva and it would not be possible, or advisable, to biopsy them all; and 5) a biopsy is not part of the standard of care for patients with lichen schlerosus and a history of vulvar cancer.
 {¶ 22} The Estate presents six assignments of error for our review.
SURPRISE TESTIMONY
 {¶ 23} In its first assignment of error, the Estate contends that the trial court erred in allowing Dr. Brodell to testify about the theory that a new ulceration appeared on Ms. Eastman's left labia in April 2002. Similarly, in its fourth assignment of error, the Estate contends that the trial court erred in allowing Dr. Edwards to testify about the invasive nature of Ms. Eastman's cancer. In both the first and fourth assignments of error, the Estate argues that it was surprised by Dr. Brodell and Dr. Edwards' testimonies, as they were not discussed prior to trial and their introduction, therefore, was prejudicial to its case.
 {¶ 24} The Estate failed, however, to object on the ground of surprise to either experts' testimony. At argument before this court, the Estate's counsel argued that the issue was nonetheless preserved for appeal because the Estate had filed a motion in limine to exclude appellees' experts from testifying from matters not included in their reports. *Page 10 
 {¶ 25} In State v. Maurer (1984), 15 Ohio St.3d 239, 473 N.E.2d 768, quoting Redding v. Ferguson (Tex.Civ.App. 1973), 501 S.W.2d 717, 722, the Ohio Supreme Court stated the following:
 {¶ 26} "`the purpose of a motion in limine is to avoid the injection into the trial, of matters which are irrelevant, inadmissible and prejudicial. * * * It also serves the useful purpose of raising and pointing out before trial, certain evidentiary rulings that the Court may be called upon to make. By its very nature, when properly drawn, its grant cannot be error. It is not a ruling on evidence. It adds a procedural step prior to the offer of evidence.'" Maurer at 259.
 {¶ 27} The Court in Maurer also stated, quoting Palmer, Ohio Rules of Evidence, Rules Manual (1984), at 446, that:
 {¶ 28} "`Although extremely useful as a trial technique, the ruling in a motion in limine does not preserve the record on appeal. The ruling is as [sic] tentative, preliminary or presumptive ruling about an evidentiary issue that is anticipated but has not yet been presented in its full context. An appellate court need not review the propriety of such an order unless the claimed error is preserved by an objection, proffer, or ruling on the record when the issue is actually reached and the context is developed at trial.'"
 {¶ 29} Thus, because the issues raised in assignments of error one and four were not preserved for review, the Estate has waived all but plain error review. Bohrer v. Bakers Square Restaurant, Cuyahoga App. No. 88143, 2007-Ohio-2223, ¶ 6. *Page 11 
In appeals of civil cases such as this, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error seriously affects the basic fairness, integrity, or public reputation of the judicial process itself. Goldfuss v. Davidson, 79 Ohio St.3d 116, 1997-Ohio-401,679 N.E.2d 1099, syllabus; In re McLemore, Franklin App. No. 03AP-714,2004-Ohio-680, ¶ 11.
 {¶ 30} Loc. R. 21.1(B) of the Court of Common Pleas of Cuyahoga County, General Division, provides in relevant part:
 {¶ 31} "A party may not call a non-party expert witness to testify unless a written report has been procured from the witness and provided to opposing counsel. * * * [U]nless good cause is shown, all supplemental reports must be supplied no later than thirty (30) days prior to trial."
 {¶ 32} This court has previously stated: "The primary purpose of Loc. R. 21 is to avoid prejudicial surprise resulting from noncompliance with the report requirement." Preston v. Kaiser (Nov. 8, 2001), Cuyahoga App. No. 78972, citing Reese v. Euclid Cleaning Contrs., Inc. (1995),103 Ohio App.3d 141, 147, 658 N.E.2d 1096. This court has further explained how to evaluate surprise:
 {¶ 33} `"A court is not required to prohibit the witness testimony where there is no evidence appellant was prejudiced by the admission of the testimony. The determination of whether the testimony results in a surprise at trial is a matter left to the sound discretion of the trial court. In the absence of surprise, there is no abuse *Page 12 
of discretion. This court has also found that when a complaining party knows the identity of the other party's expert, the subject of his expertise and the general nature of his testimony, a party cannot complain that they are ambushed.'" Miller v. Gen. Motors Corp., Cuyahoga App. No. 87484, 2006-Ohio-5733, ¶ 11, quoting Yaeger v. Fairview Gen.Hosp. (Mar. 11, 1999), Cuyahoga App. No. 72361.
 {¶ 34} In regard to Dr. Brodell's testimony, the Estate claims that Dr. Brodell offered "new" testimony at trial regarding the persistence of the original ulceration. In particular, the Estate claims that Dr. Brodell testified for the first time at trial that the August 29 lesion had resolved by January 2002.
 {¶ 35} Upon review, we find that Dr. Brodell's trial testimony was consistent with his expert report. In his report, and at trial, Dr. Brodell noted that Dr. Hirsh's January 4 office notes indicated "redness and scant erosions." Dr. Brodell explained on cross-examination at trial that he interpreted the above note made by Dr. Hirsh to mean that the ulceration from August 2001 was not present in January 2002. Dr. Brodell's testimony in this regard was based upon his interpretation of Dr. Hirsh's notes. The Estate was privy to Dr. Hirsh's notes and we are not persuaded by its claim of surprise in Dr. Brodell's testimony regarding them.
 {¶ 36} Moreover, Dr. Brodell did not testify, as the Estate contends, that he could not differentiate between the August 2001 ulceration and the April 2002 ulceration. Rather, Dr. Brodell attempted to explain that he did not believe the *Page 13 
August laceration was the same one detected in April, but was cut off by the Estate's counsel.
 {¶ 37} In regard to Dr. Edwards, the Estate claims that it was surprised by his trial testimony about the "invasive nature" of Ms. Eastman's cancer. The record does not support this allegation. Although Dr. Edwards's expert report does not use the words "invasive" or "aggressive," it does state that Ms. Eastman's cancer was "atypical" and that her "death was largely in part to a tumor biology * * *." Further, at deposition, Dr. Edwards testified that metastatic vulvar cancer is "almost uniformly lethal."
 {¶ 38} Accordingly, there was no surprise at trial about the experts' testimonies and the Estate's first and fourth assignments of error are overruled.
ALTERNATE JUROR
 {¶ 39} For its second assigned error, the Estate contends that the trial court erred by allowing an alternate juror who had previously been a patient of Dr. Hirsh to be impaneled.
 {¶ 40} The Estate has waived a challenge to the seating of the alternate juror because of its failure at trial to challenge for cause. See State v. Fitzpatrick, 102 Ohio St.3d 321, 2004-Ohio-3167,810 N.E.2d 927, f79, fn 1. It was only after the Estate had exercised its challenges for cause, voir dire was completed, the jury had been sworn, and preliminary instructions had been given, that the Estate attempted to raise the issue: *Page 14 
 {¶ 41} "[Defense counsel]: The plaintiffs, for the record, object to alternate one * * * because she was treated by the defendant. Thank you.
 {¶ 42} "The Court: She was what?
 {¶ 43} "[Defense counsel]: She has been treated by the defendant, she testified — or she stated. Just for the record, your honor.
 {¶ 44} "The Court: All right."
 {¶ 45} This objection was untimely, and certainly was not a challenge for cause and, therefore, the Estate has waived any challenge to the seating of the alternate juror.
 {¶ 46} Moreover, although the alternate stated that she had been treated by Dr. Hirsh for a mole, she specifically stated, in response to the court's questioning, that if the evidence so warranted, she would be able to render a verdict in favor of the Estate, or conversely, in favor of appellees. Further, the alternate juror never deliberated and, therefore, there clearly was no prejudice to the Estate.
 {¶ 47} The second assignment of error is overruled.
MANIFEST WEIGHT OF THE EVIDENCE
 {¶ 48} In its third assignment of error, the Estate contends that the jury's verdict was against the manifest weight of the evidence.
 {¶ 49} As to civil judgments, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. *Page 15 Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279,376 N.E.2d 578, syllabus. When considering whether a civil judgment is against the manifest weight of the evidence, an appellate court is guided by a presumption that the findings of the trier of fact were correct.Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 79-80,461 N.E.2d 1273. "[A]n appellate court should not substitute its judgment for that of the trial court when there exists * * * competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial judge." Id. at 80.
 {¶ 50} "In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things."Bruni v. Tatsumi (1976), 46 Ohio St.2d 127, 346 N.E.2d 673, paragraph one of the syllabus.
 {¶ 51} In this case, the Estate's theory was that any new ulceration Ms. Eastman had should have been considered cancerous until determined otherwise. Accordingly, the Estate contends that Dr. Hirsh's treatment of Ms. Hirsh fell below *Page 16 
the applicable standard of care because he did not biopsy her on August 29, 2001, or shortly thereafter. The Estate's expert, Dr. Copeland, testified to that effect.
 {¶ 52} Dr. Hirsh, however, presented contradictory evidence. That evidence included testimony that Ms. Eastman's 2001 ulceration was markedly different from the lesion she had in 1998. The evidence further demonstrated that the August 2001 ulceration had resolved by January 2002. Similarly, other ulcerations Ms. Eastman had also resolved. Dr. Hirsh presented testimony that those ulcerations had resolved by Ms. Eastman's use of oral and topical medications he had prescribed, and that if they had been cancerous, they would not have resolved with such medications. Dr. Hirsh also presented evidence of the risks a biopsy would have presented to Ms. Eastman given her condition.
 {¶ 53} Because the record contains some competent, credible evidence to support the jury's finding in favor of the defense, we will not disturb that finding.
 {¶ 54} The third assignment of error is overruled.
MOTIONS FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND FOR NEW TRIAL
 {¶ 55} For its fifth assigned error, the Estate contends that the trial court erred in denying its motions for judgment notwithstanding the verdict and for a new trial.
 {¶ 56} We review the trial court's ruling on a motion for judgment notwithstanding the verdict de novo, applying the same standard of review the trial court used. Kanjuka v. MetroHealth Med. Ctr.,151 Ohio App.3d 183, 2002-Ohio-6803, 783 N.E.2d 920, ¶ 14. A motion for judgment notwithstanding the verdict may *Page 17 
be granted if, viewing the evidence in the light most favorable to the non-moving party, reasonable minds can come to but one conclusion on a determinative issue, and that conclusion is adverse to the non-moving party. Id.
 {¶ 57} After viewing the evidence in the light most favorable to Dr. Hirsh, and for the reasons already discussed in addressing the Estate's manifest weight of the evidence argument, we find that reasonable minds could not come to only a conclusion adverse to Dr. Hirsh. Thus, the trial court did not err in denying the Estate's motion for JNOV.
 {¶ 58} We review the denial of a motion for a new trial for an abuse of discretion. Sharp v. Norfolk W. Ry. Co., 72 Ohio St.3d 307, 312,1995-Ohio-224, 649 N.E.2d 1219. Unless the trial court's decision was unreasonable, arbitrary, or unconscionable, we will not disturb it on appeal. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219,450 N.E.2d 1140.
 {¶ 59} In essence, we have already addressed and overruled the grounds for a new trial that were listed by the Estate: weight of the evidence, surprise in the testimony of Dr. Hirsh's experts, and impaneling of the alternate juror. We therefore find that the trial court did not abuse its discretion by denying the motion for a new trial.
 {¶ 60} The fifth assignment of error is overruled.
 DEMONSTRATIVE AID *Page 18 
 {¶ 61} For its sixth and final assignment of error, the Estate argues that the trial court abused its discretion by allowing a demonstrative aid which mislead the jury.
 {¶ 62} The aid in question, a diagram of the female vaginal area, was not admitted into evidence and was not preserved for review by this court. Nonetheless, we consider whether the use of the diagram created unfair prejudice and confusion of the issues. See Evid. R. 403(A).
 {¶ 63} On direct examination, Dr. Hirsh testified that if a female patient has a dermatological concern in her vaginal area, he will examine it. He testified that he is familiar with the anatomic makeup of the female genitalia, and he testified that the diagram in question accurately represented the area. Dr. Hirsh further testified that the aid was a drawing and that it was for illustrative purposes. Dr. Hirsh also testified that, although the drawing was not done at the time of his treatment of Ms. Eastman, it accurately corresponded to his notes relative to her treatment.
 {¶ 64} On this record, the aid did not create unfair prejudice and confusion of the issues. Accordingly, the sixth assignment of error is overruled.
Judgment affirmed.
It is ordered that appellees recover from appellants costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution. *Page 19 
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 JAMES J. SWEENEY, A.J., and ANN DYKE, J., CONCUR *Page 1