McWREATH, Appellee,

v.

ROSS, Appellant.

[Cite as McWreath v. Ross, 179 Ohio App.3d 227, 2008-Ohio-5855.]

Court of Appeals of Ohio,
Eleventh District, Trumbull County.

No. 2008-T-0035.

Decided Nov. 7, 2008.

228

David G. Lake, for appellee.

Williams, Moliterno & Scully Co., L.P.A., Roger H. Williams, Joshua R. Angelotta, and Joseph H. Wantz, for appellant.

MARY JANE TRAPP, Judge.

{¶ 1} Abbey R. Ross appeals from a judgment of the Trumbull County Court of Common Pleas granting a new trial to Larry J. McWreath after a jury awarded McWreath zero damages in a personal-injury action he filed in connection with an automobile accident. For the following reasons, we affirm.

{¶ 2} **Substantive Facts and Procedural History**

{¶ 3} The following facts are uncontested. On April 15, 2005, while driving a Pontiac Sunfire north on Route 46 in Howland, Ohio, Ross rear-ended a Ford F-150 truck driven by McWreath near the intersection of Routes 46 and 82. A patrolman arrived at the scene and investigated the accident. Neither driver reported any injury at the time, and both drivers drove from the accident scene. Ross was cited for assured clear distance. The damage to McWreath's Ford truck amounted to $1,871.11, mostly for repairing its rear bumper, and the damage to Ross's Pontiac amounted to $602.35.

{¶ 4} McWreath began to experience neck pain and headaches a week after the accident. He received medical treatment and eventually underwent two neck surgeries, incurring medical bills totaling $59,158.53.

{¶ 5} On October 3, 2006, McWreath filed his complaint against Ross, and a jury trial was held in December 2007. Ross stipulated to her negligence and to the authenticity of the medical bills offered by McWreath. The court instructed the jury as follows:

{¶ 6} "There is no dispute as to fault in this case so the issues for you will be the proximate cause of any injuries and the nature and extent in monetary numbers of the injuries that were proximately caused."

{¶ 7} Describing the accident, McWreath testified that after passing the intersection of Routes 82 and 46, while he stopped and waited for a vehicle several cars ahead to make a left turn, he was rear-ended by the vehicle behind him. Describing the impact, he stated, "I got thrust back into the seat. I have a little bit of a habit of sitting up forward when I am driving, but I got tossed to the back and then front after I bounced off the seat."

{¶ 8} He testified that a week after the accident, he began to experience neck pain and headaches. Eleven days after the accident, he visited his family doctor, Dr. Paloski, complaining of neck pain and headaches. He reported to his doctor that the pain and headaches were caused by the April 15, 2005 accident and were

unrelated to some sinus problems for which he had seen Dr. Paloski the day before the accident.

{¶ 9} After an examination of McWreath, Dr. Paloski ordered an X-ray and an MRI. The MRI was performed on May 3, 2005, and it revealed a herniated disc. Dr. Paloski referred him to a neurosurgeon, Dr. Brocker, and continued to treat him for his pain.

{¶ 10} On August 2, 2005, McWreath was examined by Dr. Brocker, who prescribed pain medications, a muscle relaxer, and Neurontin, as well as home exercises, but did not think McWreath was a candidate for surgery at the time. While the pain became progressively worse, McWreath began to see Dr. Brocker on a regular basis. Dr. Brocker changed the dosage of the medications a few times, but it eventually stopped working. On April 10, 2006, Dr. Brocker performed a neck surgery on McWreath.

{¶ 11} McWreath's testimony also revealed that a month before the neck surgery performed by Dr. Brocker, he underwent a surgery to correct a work-related problem on his right shoulder, performed by an orthopedic surgeon, Dr. Jones.

{¶ 12} McWreath testified that he felt "really good" after the April 2006 neck surgery, but a month and a half after the surgery, he began to feel pain in his neck again. He obtained a second opinion from Dr. Pagano, who determined that another surgery was necessary because the bones inside his neck were not healing well after the first surgery. McWreath also found out for the first time from Dr. Pagano that his use of tobacco hindered the healing of his bones. In September 2007, Dr. Pagano performed a second surgery on his neck.

{¶ 13} McWreath testified that he had two prior automobile accidents, in 1990 and 1992. He sustained no injuries in the 1992 accident, which he described as a "fender bender." In the 1990 accident, he suffered a whiplash and a hip injury. He was given a soft collar for his neck and also saw a chiropractor for his neck and his back. For his hip injury, he underwent a surgery on his left hip.

{¶ 14} Amy McWreath, who married McWreath in December 2005, testified that after the April 2005 accident, McWreath was in a lot of pain and was not as mobile.

{¶ 15} In a videotaped deposition shown to the jury, Dr. Brocker described the surgery he performed on McWreath. He removed three discs from his neck, including the herniated disc and two immediately adjacent discs that had suffered degenerative changes. He explained that it was necessary to remove all three discs because "if you just removed one disc, the next level would wear out and fall apart. So while you are in there, the logic is to fix everything while you are on

the inside. And the two superior levels immediately adjacent to the herniated disc[ ] were bad."

{¶ 16} The deposition transcript also reflects the following testimony:

{¶ 17} "Q. Doctor, I want to ask you a question again regarding a medical opinion, and ask that you base your answer upon your training and skills as a physician, your education, educational background, your years of practice here in the orthopedic industry, and that you answer it to a reasonable degree of medical certainty. Could you do that for me?

{¶ 18} "A. Yes.

{¶ 19} "Q. Doctor, do you have an opinion whether or not the automobile accident of April 15, 2005, was a direct and proximate cause of the herniated disc that you described to us today and that you treated and that you surgically repaired?

{¶ 20} "[DEFENSE COUNSEL]: Objection.

{¶ 21} "A. Yes, it was.

{¶ 22} "Q. What is your opinion?

{¶ 23} "A. That it was directly a result of the accident, the disk herniation that I repaired.

{¶ 24} "Q. [W]ith reference to the two adjoining discs, were they somehow related as well to the automobile accident?

{¶ 25} "[Defendant's counsel]: Objection.

{¶ 26} "A. Yes. I would say it was aggravated.

{¶ 27} "Q. Explain what you mean by that, Doctor."

{¶ 28} "A. He had degenerative changes. I call it the wear and tear of life at those adjacent levels, and having a violent injury to the neck can aggravate—they are pinched from the degenerative change, the nerves are, and then you aggravate it by, you know, a sudden blow from behind. A whiplash kind of injury can aggravate preexisting processes in the neck."

{¶ 29} On cross-examination, Dr. Brocker agreed that based on his reading of the X-ray reports from the earlier accidents, it would be "fair" to say that "it would appear at least there was some concern about a possible neck injury in each of those two prior accidents."

{¶ 30} The deposition transcript also reflects the following cross-examination of Dr. Brocker by Ross's counsel:

{¶ 31} "Q. You indicated I think already that Mr. McWreath did have some degenerative changes in his cervical spine?

{¶ 32} "A. Correct.

{¶ 33} "Q. In the neck region; correct?

{¶ 34} "A. Correct.

{¶ 35} "Q. And those degenerative changes themselves are not related to the accident; would that be fair?

{¶ 36} "A. Correct.

{¶ 37} " * * *.

{¶ 38} "Q. All right. Herniated discs occur in a variety of ways; is that correct?

{¶ 39} "A. Yes.

{¶ 40} "Q. All right. And they occur as a result of degeneration, as well as trauma; right?

{¶ 41} "A. Yes.

{¶ 42} "Q. [W]ould it be fair to say that you can't state with any certainty whether or not that herniated disc in Mr. McWreath's neck was there before this accident?

{¶ 43} "A. Ask that question again.

{¶ 44} "Q. As we sit here, would you agree that—I will reask it in a different way, make it maybe clearer. Would you agree that it's possible that that herniated disc was in Mr. McWreath's neck before this motor vehicle accident?

{¶ 45} "[Plaintiff's counsel: I'm going to object.

{¶ 46} "A. That it's possible?

{¶ 47} "Q. Yes.

{¶ 48} "A. Yes."

{¶ 49} The depositions of Dr. Kulper and Dr. Pagano were also read before the jury. McWreath had been a patient of Dr. Kulper's for several years up to March 2004. Dr. Kulper testified that McWreath had no neck problems during the time he treated him. Dr. Pagano, who performed the second neck surgery on McWreath in September 2007, testified that the bones in McWreath's neck did not heal well after his first neck surgery performed by Dr. Brocker. He stated that the use of tobacco can affect the healing after the surgery. He testified that the second neck surgery was required because of the problems that developed after the first surgery.

{¶ 50} The defense presented two witnesses but no expert medical testimony. Ross testified on her own behalf. She described the accident as follows: "The gentleman in front of me stopped abruptly or stopped and I stopped in time and I

looked down just briefly, but his brake lights had gone off so I took my foot off my brakes and when I looked up, I was unable to stop in time and I bumped his bumper." Patrolman Eric Hoso, who investigated the accident, identified the accident report and testified that there was no claim of injury at the scene and both drivers drove their vehicles from the scene.

{¶ 51} The record contains exhibits submitted at trial by McWreath, which include his medical bills from Dr. Paloski and Dr. Brocker in 2005 and 2006, and from Dr. Pagano (relating to the second neck surgery) in 2007. The defense submitted its own documentation of the medical bills, including documentation showing medical bills from Dr. Paloski in 2005 totaling only $570.

{¶ 52} In closing arguments, McWreath's counsel asked the jury for an award of $300,000 for his injury and $59,000 for the total medical expenses he incurred. The defense counsel, on the other hand, argued that the jury should award McWreath damages in the amount of only $6,500, which would encompass $5,000 for pain and suffering, and $1,400.58, the amount representing the medical bills from Dr. Paloski and Dr. Brocker between April 2005 and the end of 2005, and for the MRI performed on May 3, 2005.

{¶ 53} Following deliberations, the jury returned a verdict of zero damages, and the trial court entered a judgment on the jury's verdict. McWreath timely filed a motion for a new trial pursuant to Civ.R. 59. He contended that a new trial was warranted because there existed misconduct committed by the jury or the plaintiff's counsel, and because the judgment was not sustained by the weight of the evidence.

{¶ 54} The trial court granted the motion on the ground that in awarding zero damages, the jury had lost its way, because there was no evidence or testimony to support that verdict. The trial court's judgment noted that there was expert testimony presented by the plaintiff that the medical expenses were all proximately caused by the accident, while the defendant offered no medical testimony other than a cross-examination of the plaintiff's experts.

{¶ 55} In concluding that the jury in this case lost its way, the trial court stated that "[i]n review of the case the Court finds no witness or expert who testified that a zero verdict would be appropriate. Furthermore defense counsel felt compelled to acknowledge that some compensation was appropriate for Plaintiff's initial evaluation and treatment."

{¶ 56} Ross now appeals from that judgment. She raises one assignment of error, which states:

{¶ 57} "[1.] The trial court abused its discretion in granting the Appellee's Motion for a New Trial."

{¶ 58} Ross argues that the court abused its discretion in granting a new trial because the jury verdict was not a result of jury or counsel misconduct, and because the verdict was supported by the manifest weight of the evidence.

{¶ 59} McWreath's motion for a new trial was based on (A)(2) and (A)(6) of Civ.R. 59(A), which provides:

{¶ 60} "(A) Grounds.

{¶ 61} "A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:

{¶ 62} " * * *

{¶ 63} "(2) Misconduct of the jury or prevailing party;

{¶ 64} " * * *.

{¶ 65} "(6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case."

{¶ 66} A review of the trial court's judgment granting McWreath a new trial indicates that its decision was based on the conclusion that the zero verdict rendered by the jury was not sustained by the weight of the evidence in this case. Therefore, the issue for our review is whether the trial court properly granted a new trial pursuant to Civ.R. 59(A)(6).

{¶ 67} **Standard of Review**

{¶ 68} " 'In deciding a motion for a new trial based on the weight of the evidence, the trial court must weigh the evidence and pass upon the credibility of witnesses. However, the trial court's weighing of the evidence differs from that of the jury in that it is restricted to determining whether manifest injustice has been done and whether the verdict is, therefore, manifestly against the weight of the evidence.' " *Charter Express, Inc. v. Indep. Ins. Serv. Corp.* (Apr. 10, 1992), 11th Dist. No. 91–P–2296, 1992 WL 190184, *12, quoting *Jones v. Olcese* (1991), 75 Ohio App.3d 34, 598 N.E.2d 853.

{¶ 69} As an appellate court, we review a trial court's judgment on a Civ.R. 59 motion for a new trial under the abuse-of-discretion standard. *Effingham v. XP3 Corp.*, 11th Dist. No. 2006–P–0083, 2007-Ohio-7135, 2007 WL 4564873, at ¶ 18. We will adhere to the principle that the granting of a motion for a new trial rests within the sound discretion of the trial court and will not be disturbed upon appeal unless there has been an abuse of that discretion. *Pena v. Northeast Ohio Emergency Affiliates, Inc.* (1995), 108 Ohio App.3d 96, 104, 670 N.E.2d 268. See also *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685, paragraph one of the syllabus (where a trial court is authorized

to grant a new trial for a reason that requires the exercise of a sound discretion, the order granting a new trial may be reversed only upon a showing of abuse of discretion by the trial court). "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

{¶ 70} As the Supreme Court of Ohio explained in *Rohde,* 23 Ohio St.2d at 94, 52 O.O.2d 376, 262 N.E.2d 685:

■ {¶ 71} "[W]here the appeal is from the granting of a motion for new trial, and the trial court's decision on the motion for new trial involves questions of fact, it has been held that the appellate court should view the evidence favorably to the trial court's action rather than to the original jury's verdict. 5 American Jurisprudence 2d 326, Section 887.

{¶ 72} "This rule of appellate review is predicated, in part, upon the principle that the discretion of the trial judge in granting a new trial on the weight of the evidence may be supported by his having seen and heard the witnesses and having formed a doubt as to their credibility, or having determined from the surrounding circumstances and atmosphere of the trial, that the jury's verdict resulted in manifest injustice."

{¶ 73} This court has similarly recognized that " 'the trial judge is better situated than a reviewing court to pass on questions of witness credibility and the "surrounding circumstances and atmosphere of the trial." ' " *Kitchen v. Wickliffe Country Place* (July 13, 2001), 11th Dist. No.2000–L–051, 2001 WL 799750, at *2, quoting *Malone v. Courtyard by Marriott L.P.* (1996), 74 Ohio St.3d 440, 659 N.E.2d 1242, quoting *Rohde,* 23 Ohio St.2d at 94, 52 O.O.2d 376, 262 N.E.2d 685.

{¶ 74} Furthermore, as the Supreme Court of Ohio stated recently, in *Harris v. Mt. Sinai Med. Ctr.* (2007), 116 Ohio St.3d 139, 2007-Ohio-5587, 876 N.E.2d 1201, ¶ 46:

■ {¶ 75} "When in the exercise of discretion a trial court decides to grant a new trial and that decision is supported by competent, credible evidence, a reviewing court must defer to the trial court. In such a case, the reviewing court may not independently assess whether the verdict was supported by the evidence, because the issue is not whether the verdict is supported by competent, credible evidence, but rather whether the court's decision to grant the new trial is supported by competent, credible evidence."

{¶ 76} In this case, the parties stipulated to Ross's negligence, and the issues for the jury's determination were the proximate cause of any injuries and the nature and extent of damages.

{¶ 77} McWreath, as plaintiff, bore the burden to prove that he suffered an injury from the automobile accident and incurred damages. He testified that he experienced pain in his neck a week after the April 15, 2005 automobile accident. He went to see his family doctor, Dr. Paloski, who ordered X-rays and also an MRI, which revealed a herniated disc in his neck. He received treatments from Dr. Paloski between April and July 2005, and several times in 2006, and was also evaluated by a neurosurgeon, Dr. Brocker, in August 2005. He was treated by Dr. Brocker during several visits in 2005 and 2006, and he eventually had a neck surgery performed by Dr. Brocker in April 2006.

{¶ 78} For his prima facie demonstration that the disc herniation in his neck was proximately caused by the automobile accident, McWreath presented expert testimony from Dr. Brocker, who stated with a reasonable degree of medical certainty that the April 15, 2005 injury was the direct and proximate cause of McWreath's herniated disc, which he repaired in the April 2006 surgery.

{¶ 79} Once a prima facie case has been demonstrated, an adverse party may attempt to negate its effect in various ways. She may cross-examine the expert of the other party; she may adduce testimony from another expert that contradicts the testimony of the expert for her adversary; further, she may adduce expert testimony that sets forth an alternative explanation for the circumstances at issue. See *Stinson v. England* (1994), 69 Ohio St.3d 451, 455–456, 633 N.E.2d 532. Here, Ross did not present any medical evidence to contradict Dr. Brocker's testimony, but chose to rely on a cross-examination of Dr. Brocker. She attempted to show, through that cross-examination, that the disc herniation was caused by a preexisting degenerative condition of the disc and not by the instant accident.

{¶ 80} The transcript shows that under cross-examination, Dr. Brocker agreed that McWreath had some degenerative changes in his cervical spine in the neck region. When asked by Ross's counsel whether herniated discs could occur as a result of degeneration as well as trauma, he answered "yes." Further, when asked if "it's possible" that the herniated disc was in McWreath's neck before the accident, he also answered "yes."

{¶ 81} This testimony reflects Dr. Brocker's opinion that in general, herniated discs could be caused by degeneration as well as by trauma and that there was a *possibility* that the herniated disc in McWreath's neck existed prior to the accident. It does not show, however, that Dr. Brocker believed the disc herniation suffered by McWreath was *probably* caused by degeneration and in existence prior to the April 2005 accident. Dr. Brocker's testimony under cross-examination, therefore, was not inconsistent with his conclusion, which he stated with a reasonable degree of medical certainty, that the disc herniation was caused by the accident.

{¶ 82} Thus, the expert testimony that McWreath's herniated disc was caused by the instant automobile accident is uncontroverted. We recognize that the term of art "uncontroverted" is not limited to refer to a failure of the defending party to provide a rebuttal expert witness. As the court stated in *McCabe v. Sitar*, 7th Dist. No. 06 BE 39, 2008-Ohio-3242, 2008 WL 2583737, ¶ 23:

{¶ 83} "When the evidence is 'uncontroverted,' the record reflects that there is no rebuttal evidence at all, looking at the entire range of evidence presented at trial. 'Rebuttal evidence' is evidence that explains, repels, counteracts, or disproves facts given in evidence by the adverse party. *Nickey v. Brown* (1982), 7 Ohio App.3d 32, 35 [7 OBR 34], 454 N.E.2d 177. If only one expert testifies, cross-examination of that expert may very well reveal contradictions and even repudiations of earlier statements made by the expert. Inconsistencies and errors in an expert's testimony may qualify as rebuttal evidence. *State v. Thompson* (1987), 33 Ohio St.3d 1, 11, 514 N.E.2d 407."

{¶ 84} Here, the testimony that the accident caused the disc herniation is uncontroverted not because Ross did not present an expert of her own, but because she failed to present rebuttal evidence, through her cross-examination of McWreath's expert, that the herniated disc was caused by a preexisting degenerative condition. This is because the only testimony she was able to elicit from Dr. Brocker was that herniation of discs could occur due to degeneration as well as trauma and that it is *possible* that the disc herniation was a result of degeneration. However, by asking whether the herniated disc could be pre-existing prior to the 2005 accident in terms of *possibility* instead of *probability*, the defense's cross-examination of Dr. Brocker failed to reveal any contradictions, repudiations, inconsistencies, or errors in his testimony that he believed McWreath's herniated disc was caused by the accident. In fact, that testimony, framed in a mere possibility, does not even meet the standard of admissibility required for expert testimony setting forth an alternative explanation. See *Stinson*, 69 Ohio St.3d at 456, 633 N.E.2d 532 ("expert opinion regarding a causative event, including alternative causes, must be expressed in terms of probability").

{¶ 85} We recognize that a trier of fact is not required to believe an expert giving the testimony. *McCall v. Mareino* (2000), 138 Ohio App.3d 794, 799, 742 N.E.2d 668; see also *In re Baby Girl Doe*, 149 Ohio App.3d 717, 2002-Ohio-4470, 778 N.E.2d 1053, ¶ 75 (the trier of fact is free to believe or disbelieve any witness, including an expert witness).

{¶ 86} However, even if the jury did not believe Dr. Brocker's testimony that the 2005 automobile accident caused the disc herniation necessitating the neck surgery he performed in April 2006, the evidence shows that McWreath experienced neck pain and headaches a week after the accident and sought evaluation

and treatment from Dr. Paloski, who ordered X-rays and an MRI, treated his pains, and also referred him to Dr. Brocker for further assessment and treatment. The documentation regarding these medical expenses was submitted at trial by both McWreath and Ross.

{¶ 87} Thus, evidence was presented at trial showing that McWreath incurred medical bills for initial diagnostic exams and treatments by Dr. Paloski and Dr. Brocker subsequent to the April 2005 accident. Ross did not argue that Dr. Paloski or Dr. Brocker employed unnecessary diagnostic examinations or treatments for his pains. The weight of the evidence demonstrating that at least *some* medical expenses were proximately caused by the automobile accident is reflected in the closing argument by the defense counsel, who recommended that the jury award McWreath the medical expenses he incurred in 2005 for the initial evaluations and treatments for his neck pains.

{¶ 88} We are constrained to review a trial court's granting of a new trial with deference. Viewing the evidence favorably to the trial court's action, *Rohde*, 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685, we conclude that the trial court's decision to grant McWreath a new trial is supported by competent and credible evidence. Although the facts in the instant case could be used to explain a minimal award of damages far short of what was requested by McWreath, they cannot support an award of zero damages. The trial court's decision to grant McWreath a new trial is not arbitrary or unconscionable in the context of the evidence presented in this case. The assignment of error is overruled.

{¶ 89} The judgment of the Trumbull County Court of Common Pleas is affirmed.

Judgment affirmed.

O'TOOLE and CANNON, JJ., concur.