[Cite as *Rybak v. Main Sail, L.L.C.*, 2012-Ohio-2298.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 96899**

## THOMAS RYBAK

PLAINTIFF-APPELLANT

vs.

## MAIN SAIL, LLC

DEFENDANT-APPELLEE

**JUDGMENT:**
**AFFIRMED**

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-693345

**BEFORE:** Kilbane, J., Rocco, P.J., and E. Gallagher, J.

**RELEASED AND JOURNALIZED:** May 24, 2012

**ATTORNEYS FOR APPELLANT**

Joseph T. Dattilo
Caroline L. Marks
Michael P. O'Donnell
Brouse McDowell
600 Superior Avenue East
Suite 1600
Cleveland, Ohio 44114

**ATTORNEY FOR APPELLEE**

Ronald P. Friedberg
Meyers, Roman, Friedberg & Lewis
28601 Chagrin Boulevard
Suite 500
Cleveland, Ohio 44122

MARY EILEEN KILBANE, J.:

{¶1}   Plaintiff-appellant, Thomas Rybak, appeals from the order of the trial court that denied his motions for directed verdict, judgment notwithstanding the verdict, and new trial on his claim for breach of contract.   For the reasons set forth below, we affirm.

{¶2}   On January 27, 2002, Rybak was hired by defendant-appellee, Main Sail, LLC ("Main Sail" or "the company"), a computer software consulting company owned by:  Scott Harris ("Harris"), Brian Conley, Ken Conley, and Rob MacKinlay (the "Members").   Under the terms of his initial employment agreement, Rybak was to be paid on a "commission only" basis, with no provision for a guaranteed income.   However, the parties agreed that the terms of Rybak's compensation would be "modified to provide for a base salary and other compensation" once Main Sail began to generate more revenue.

{¶3}   From January 2002 through May 2002, Rybak earned $10,549.50. Effective June 1, 2002, Main Sail began to pay him a fixed salary of $96,000 per annum. Later that year, his yearly salary was increased to $120,000.   On July 3, 2003, the parties entered into an "Addendum to Employment Agreement" ("Addendum"), drafted by Main Sail, which provided in relevant part as follows:

> 1. "Target Level' Compensation."   In January 2002[,] you joined Main Sail, LLC (the "Company") under a commission-based program designed to create incentive and opportunity for you as a valued member of our management team.   *Effective June 1, 2002*, *your compensation arrangements were restructured* to provide a salary in lieu of a commission-only based program.   When you joined the Company and when

your compensation was restructured, our joint objective was to establish a $200,000 per annum "target level" (gross draw) for you and each of the Company's owners - Brian Conley, Ken Conley, Scott Harris and Rob MacKinlay (the "Members"). This Addendum will "reaffirm" our agreement that no bonuses or equity (profits) distributions (other than as may be required to cover Members' tax liabilities attributable to the company's income ("Tax Cash Distributions")) will be paid to any of the Members until you and the Members are all drawing compensation at the rate of at least $200,000 per annum. (Emphasis added.)

2. <u>Equalization of Compensation / Restoration of "shortfalls."</u> Since you joined the Company, you and three of the four Members have not drawn a salary at the rate of $200,000 per annum. You, the Company and the Members agree that all shortfalls, including yours, must be completely eliminated before you or any of the Members receive compensation at a rate exceeding $200,000 per annum. The elimination of these shortfalls will be accomplished through the application and payment of the Company's net available cash profits (after payment of Tax Cash Distributions and the establishment of such reserves as the Company's Managers deem appropriate)[.]

**{¶4}** The Addendum further provided for bonuses or Senior Management Distributions, or Profits Bonus, in the following provision:

The Company agrees that within ninety (90) days following the close of its fiscal year (December 31), it will review the Company's annual financial statements (profit and loss statement, balance sheet, statement of cash flows), budget and projections for the ensuing year, and contingencies. Following such review and payment to Members of Tax Cash Distributions (if any), with respect to the Company's income during such fiscal year, the Managers of the Company may declare a "Senior Management Distribution" establishing such reserves for contingent liabilities and other purposes as they deem appropriate. Assuming you remain continuously employed with the Company through the date on which the Senior Management Distribution is declared and paid, you will receive a bonus (subject to all applicable payroll deductions and withholding taxes) an amount equal to 8% of the Senior Management Distribution (the "Profits Bonus"), which will be distributed to you in four equal payments one each quarter * * * *. The Profits Bonus will not be paid until such time as the historical compensation to you and the company's Members has been fully equalized * * *.

**{¶5}** According to Main Sail's Operating Agreement, the "Tax Cash Distributions" referenced in the bonus provision were further determined based upon the company's income as set forth in its financial statements, and were determined as follows:

> The Company shall make periodic distributions of cash ("Income Tax Distributions") sufficient to permit a Member * * * to meet in a timely manner his * * * federal, state and local income tax obligations arising from ownership of a Membership interest. Distributions shall be made to the Members in accordance with their Percentages (regardless of the Member's tax status).

**{¶6}** As to compensation, Rybak's total "target level" compensation for 2002 through 2007 was $1,208,965.44, or an amount exceeding $200,000 per annum for those years. As to the calculation of other compensation in 2002 and 2003, Main Sail made no Tax Cash Distributions to the Members, and no Profits Bonuses were paid in those years. In 2004, Main Sail made Tax Cash Distributions totaling $62,599, or less than 10 percent of its cash basis income. In 2005, it made Tax Cash Distributions of 40 per cent of its cash basis income. In that year, it paid Profits Bonuses and Rybak received 8 percent in the amount of $23,889.54. In 2006, Main Sail made Tax Cash Distributions of 40 percent of its cash basis income, but did not give Profits Bonuses. In 2007, it made Tax Cash Distributions of 47 percent of its cash basis income. In that year, it paid Profits Bonuses, and Rybak received 8 percent, in the amount of $86,965.56.

{¶7} In October 2007, Main Sail notified Rybak that beginning in 2008, the terms of the Employment Agreement and Addendum would not be renewed, and he would be paid on a commission-only basis. He was also informed that he would receive an extra bonus of $100,000, payable in installments in 2008, regardless of how long he worked in 2008.

{¶8} In January 2009, Main Sail terminated Rybak. On May 20, 2009, he filed suit for breach of contract. Rybak asserted that Main Sail breached the terms of the Employment Agreement and Addendum by failing to pay him the "target level compensation" retroactively to the date when he "joined the Company," i.e., January 27, 2002, and by rectifying the "historical shortfall" to the target level compensation as of June 2002. Rybak maintained that this breach caused him to incur $83,368 in damages. He further alleged that Main Sail improperly inflated the Tax Cash Distributions to the Members in order to deprive him of the Profits Bonus or Senior Management Distribution. Specifically, he alleged that Main Sail improperly used estimated tax liabilities, and included the Member's target level compensation as company income, rather than a company expense, resulting in $211,309 in lost Profit Bonuses.[1]

{¶9} Main Sail denied liability and maintained that Rybak was fully paid all monies owed him plus additional bonus payments. It also argued that the Members' Tax Cash Distributions were properly calculated based upon each Member's total tax liability

---

[1]Rybak also included a claim for unjust enrichment that was later dismissed.

and were not used to deprive Rybak of his Profits Bonus, which, in any event, were discretionary.

{¶10} The matter proceeded to a jury trial on March 9, 2011. Rybak testified that he graduated from college in 1977 and has worked in accounting, information technology, and enterprise resource planning. He was hired to assist Main Sail in obtaining consulting projects with the federal government. Rybak testified that he was paid on a commissions-only basis through May 2002. Effective June 1, 2002, Main Sail began to pay him a fixed salary that began at $96,000 per year, and was increased to $120,000.

{¶11} Rybak stated that on July 3, 2003, the parties entered into the Addendum, under which he was to receive $200,000 per year. The Addendum set forth a "catch-up" provision that raised his salary, and the salary of all of the Members, retroactively to $200,000. The Addendum also gave Rybak 8 percent of any Senior Management Distribution or Profits Bonuses.

{¶12} Rybak subsequently learned that one of the Members received a catch-up payment that was retroactive to a date that preceded his employment with Main Sail. Rybak complained that his catch-up payments had been made retroactive to June 1, 2002, or the date on which his salary compensation plan was implemented, and not his original start date. Rybak also learned that the Members were receiving additional compensation, in the form of a Tax Cash Distribution, to cover their personal income tax liabilities. He, therefore, complained that he received $200,000 in gross or pretax salary; whereas, the

Members received $200,000 in net or post-tax salary.   Further, according to Rybak, the Tax Cash Distributions operated to deprive him of his Profits Bonus.

{¶13} Beginning in 2008, Rybak was again paid on a commission-only basis.   In addition, according to Rybak, accounts that he had helped obtain were not going to be included in determining his commission.   However, he did receive a payment of $100,000 to help him transition back to a 100 percent commission payment structure.

{¶14} Rybak acknowledged on cross-examination that he was not a Member of Main Sail and was not liable for its loans or other financial obligations.   He also acknowledged that the provision in the Addendum regarding the salary structure was effective June 1, 2002.   In addition, the Addendum established a "target level (gross draw) for you and each of the Company's owners" of $200,000, rather than a net draw of $200,000.   However, he insisted that the point of the Addendum was to make the compensation levels equal, and giving the Members additional Tax Cash Distribution made the salaries unequal.

{¶15} As to his complaint that the Tax Cash Distribution deprived him of the Profits Bonus, he conceded that such payments were determined on the basis of the company's financial statements and not its tax returns, and that such payments were made within the discretion of the Members.   He also conceded that Main Sail declared Profits Bonuses only in 2005 and 2007, and he received a Profits Bonus in both of those years. Finally, from 2002-2007, Rybak received total compensation of $1,208,965, and this sum

exceeds the target level compensation of $200,000 per annum for the disputed period. He also received additional income of $5,000 in 2003, and a computer valued at $4,000.

{¶16} Harris, one of the owners of Main Sail, testified on cross-examination. He admitted that the spirit of the Addendum was that no Member would make over $200,000 per annum until Rybak received this amount. However, he stated that Rybak's compensation was subject to a shorter "run rate" for 2002. He also acknowledged that in 2003, Ken Conley received $210,000, whereas Rybak received $146,000. Harris claimed, however, that Rybak received additional compensation in the form of health insurance.

{¶17} Rybak's expert, certified public accountant Jeffrey Mordaunt, testified that he reviewed the Employment Agreement, the Addendum, and Main Sail's financial statements and tax returns in this matter. He stated that the Addendum's guarantee of a "target level (gross draw)" would not include health care benefits and would not take into account tax liabilities. In addition, the "catch-up" provision required Main Sail to compensate Rybak, and the others, at the rate of $200,000 per year, before any Profits Bonus could be paid. Under this provision, Rybak's salary for the entire year of 2002 should have been $200,000. The deficiency totaled $83,368.

{¶18} Further, according to Mordaunt, Main Sail improperly included the $200,000 per year salary of each of the Members as income, rather than as a company expense or guaranteed payment. This income, inflated by approximately $280,000 from 2002-2007, in turn established an improper basis for the payment of Tax Cash Distributions to each of

the Members, and left less money available for the Profits Bonus. The deficiency in Profits Bonus payments was approximately $211,309.

{¶19} On cross-examination, Mordaunt admitted that the Addendum does not use the term "guaranteed payments" and it is the Members and not Main Sail who must pay the tax liability on their compensation. He also admitted that he assumed a tax rate of 32.12 percent in making his calculations, but tax rates as high as 48 percent have been used for such calculations. In addition, the Members would also be responsible for self-employment taxes such as Social Security and Medicare taxes. Further, for some years when its income was lower, Main Sail computed its Tax Cash Distribution using a tax rate of only 7 percent.

{¶20} Mordaunt admitted that in calculating the damages herein, he did not include the $5,000 payment made to Rybak in 2003. He also noted that in 2005 and 2007, Rybak was paid sums that exceeded the target compensation level.[2]

{¶21} Following Rybak's presentation of evidence, the defense moved for a directed verdict. The trial court denied the motion and Main Sail then presented testimony from Harris and Robert Turner ("Turner"), a certified public accountant and value analyst.

{¶22} Harris testified that the compensation set forth in the Addendum was to be effective June 1, 2002, a date used in that document. But Rybak was not made a member

---

[2]Rybak was paid $218,425 in 2005 and $231,520 in 2007.

of Main Sail. Rybak's total "target level" compensation for 2002 through 2007 was $1,208,965.44, an amount exceeding $200,000 per year for those years.

{¶23} Harris further testified that Main Sail's operating agreement for the Members provides that the company would make Tax Cash Distributions. This provision was included to avoid legal problems in the event that the Members failed to pay their taxes, because under the LLC business structure, the LLC is a pass-through entity, and the profits and losses of the company are passed on to the owners and reported on their personal tax returns.

{¶24} In 2002 and 2003, no Tax Cash Distributions were made to the Members, and no Profits Bonuses were paid. In 2004, Main Sail made Tax Cash Distributions totaling $62,599, or less than 10 percent of its cash basis income. In 2005, Main Sail made Tax Cash Distributions of 40 percent of its cash basis income to the Members per its financial statements. In that year, it paid Profits Bonuses, and Rybak received 8 percent of the bonus, in the amount of $23,889.54. In 2006, Main Sail made Tax Cash Distributions of 40 percent of its cash basis income to the Members, but it did not give Profits Bonuses. According to Harris, no Profits Bonuses were paid because the company "owed a million dollars in tax then." In 2007, Main Sail made Tax Cash Distributions of 47 percent of its cash basis income to the Members per its financial statements. In that year, it paid Profits Bonuses, and Rybak received 8 percent of the bonus, in the amount of $86,956.56.

**{¶25}** On cross-examination, Harris acknowledged that the stated objective of the Addendum was to "establish a $200,000 per annum 'target level' (gross draw)," but he denied that the "gross draw" reference was meant to equalize all earnings before taxes, and he stated that Rybak frequently complained that the company paid the Members' taxes but did not pay his.

**{¶26}** Harris also refuted the claim that Main Sail had inflated its income in order to make the Tax Cash Distributions, testifying that because the company is a limited liability company, the target level compensation of Rybak and the Members are not company expenses but are instead "distributions." The computation of these distributions followed a series of calculations made from financial statements at the close of every calendar year. The tax rate used in making these computations varies, depending upon the company's income for that year.

**{¶27}** As to the Profits Bonuses, Harris testified that in the two years in which such bonuses were given, Rybak received 8 percent in conformity with the language of the Addendum. Profits Bonuses were not given in years in which Main Sail had large tax liabilities or other obligations.

**{¶28}** Turner testified that he reviewed the relevant contracts and financial statements and conducted various management interviews in this matter. In his opinion, Rybak was not underpaid, and Mordaunt's report contained various errors and disregarded certain payments to Rybak. First, Turner noted that Rybak had no claim to a catch-up payment in January 2002, because he did not begin work with Main Sail until February

2002. Second, Mordaunt disregarded the $100,000 bonus payment announced in 2007. Third, Mordaunt included the cost of the Members' health care coverage in calculating his claim of lost Profits Bonuses. Moreover, according to Turner, after adjusting for all of these issues, Rybak received in excess of $200,000 per year from 2002 through 2007.

{¶29} Turner also testified that Main Sail did not inflate its Tax Cash Distributions because taxes were due for 2002, and 2003, but no Tax Cash Distributions were made in these years. Adjusting for that, the company had, in Turner's view, used an average tax rate of 35 percent in the years that a Tax Cash Distribution was made. That said, even the 47 percent rate used in 2007 was fair in light of federal, state, and local taxes, and Social Security self-employment taxes.

{¶30} At the close of the evidence, Rybak moved for a directed verdict on the issue of liability. The trial court denied the motion and submitted the matter to the jury. The jury subsequently entered a general verdict in favor of Main Sail. In special interrogatories, the jury found that Main Sail did not breach the terms of the Addendum. Rybak moved for judgment notwithstanding the verdict and alternative motion for a new trial. The trial court denied these motions. Rybak now appeals, assigning two errors for our review.

{¶31} Rybak's first assignment of error states:

The trial court erred by denying Thomas Rybak's motions for directed verdict and judgment notwithstanding the jury's verdict on his breach of contract claim.

{¶32} Within this assignment of error, Rybak asserts that the trial court erred in denying his motions for a directed verdict and judgment notwithstanding the defense verdict because, he claims, reasonable jurors could only conclude that Main Sail breached its contractual duty to pay his target level salary, resulting in a $83,368 shortfall, and that it improperly paid the Members Tax Cash Distributions in order to deny him Profits Bonuses in the amount of $211,309.

{¶33} We employ a de novo standard of review in evaluating a trial court's ruling on a motion for directed verdict or judgment notwithstanding the verdict. *Whitaker v. Kear*, 123 Ohio App.3d 413, 422, 704 N.E.2d 317 (4th Dist.1997); *Kanjuka v. MetroHealth Med. Ctr.*, 151 Ohio App.3d 183, 2002-Ohio-6803, 783 N.E.2d 920 (8th Dist.).

{¶34} Civ.R. 50 sets forth the standard for granting a motion for a directed verdict and a motion for JNOV:

(A) Motion for directed verdict.

* * *

(4) When granted on the evidence.  When a motion for directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to each party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

 * * *

(B) Motion for judgment notwithstanding the verdict. Whether or not a motion to direct a verdict has been made or overruled * * * a party may

move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion; or if a verdict was not returned, such party, * * * may move for judgment in accordance with his motion. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative.

**{¶35}** In *Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275, 344 N.E.2d 334 (1976), the Ohio Supreme Court stated:

The test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict is the same test to be applied on a motion for a directed verdict. The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions. *McNees v. Cincinnati Street Ry. Co.* (1949), 152 Ohio St. 269, 89 N.E.2d 138; *Ayers v. Woodard* (1957), 166 Ohio St. 138, 140 N.E.2d 401; Civ.R. 50(A) and (B).

**{¶36}** In this matter, viewing the evidence most strongly in favor of Main Sail, as we must, we conclude that the trial court properly denied Rybak's motions for a directed verdict and for judgment notwithstanding the verdict. The record indicates that Rybak's catch-up payments were set forth in a provision that stated, "Effective June 1, 2002, your compensation arrangements were restructured[.]" From this, as well as testimony indicating that Rybak's catch-up payments were to be retroactive to June 1, 2002, or the date on which he stopped receiving a commission-only compensation and began to receive a salary, there was substantial evidence that Main Sail properly implemented the catch-up provision. Reasonable minds could conclude that Main Sail did not breach this portion of the contract.

**{¶37}** Rybak additionally complains that his target level of $200,000 in compensation was given in gross or pretax salary, whereas the Members received $200,000 in net or post-tax salary, and the provision states that the parties' "joint objective was to establish a $200,000 per annum 'target level' (gross draw) for you and each of the Company's owners." The language of the provision continues:

> This Addendum will "reaffirm" our agreement that no bonuses or equity (profits) distributions *(other than as may be required to cover Members' tax liabilities attributable to the Company's income ("Tax Cash Distributions"* will be paid to any of the Members until you and the Members are all drawing compensation at the rate of at least $200,000 per annum. (Emphasis added.)

**{¶38}** The Addendum therefore permits Main Sail to pay the Members' tax liabilities in the form of Tax Cash Distributions before equalizing compensation and restoring shortfalls. This aspect of Rybak's claim therefore must fail.

**{¶39}** In short, the evidence demonstrated that Rybak received total compensation of $1,208,965, and this sum exceeds the target level compensation of $200,000 per year for the disputed period from 2002 to 2007. Reasonable minds could therefore conclude that Main Sail met its obligations with regard to Rybak's compensation.

**{¶40}** In addition, although Main Sail's Members had been given the Tax Cash Distributions to cover their personal income tax liabilities, these payments were proper under the Operating Agreement and were not designed to deprive Rybak of his Profits Bonus. The Addendum provided that Main Sail would review its "annual financial statements * * * [and following] such review and payment to Members of Tax Cash

Distributions (if any), with respect to the Company's income during such fiscal year, the Managers of the Company may declare a 'senior Management Distribution[.]'"

{¶41} Although no Profits Bonuses were given in 2002 or 2003, the evidence demonstrated that no Tax Cash Distributions were made to the Members in those years. In 2004, the company gave no Profits Bonuses, but the Tax Cash Distributions totaled $62,599, or less than 10 percent of the Company's cash basis income. In 2005, Main Sail made Tax Cash Distributions of 40 percent of its cash basis income to the Members per its financial statements. In that year, it paid Profits Bonuses and Rybak received 8 percent of the bonus, in the amount of $23,889.54. In 2006, Main Sail made Tax Cash Distributions of 40 percent of its cash basis income to the Members, but it did not give Profits Bonuses. According to Harris, no Profits Bonuses were paid because the company "owed a million dollars in tax then." In 2007, Main Sail made Tax Cash Distributions of 47 percent of its cash basis income to the Members per its financial statements. In that year, it paid Profits Bonuses and Rybak received 8 percent of the bonus, in the amount of $86,956.56.

{¶42} Moreover, there was testimony that because Main Sail was a limited liability company and all taxes due must be paid by the individual Members, the company placed a high priority on ensuring that the taxes were paid. (Tr. 299.) This comported with the plain language of the Addendum that Main Sail would review its "annual financial statements * * * [and following] such review and payment to Members of Tax Cash Distributions (if any), with respect to the Company's income during such fiscal year, the

Managers of the Company *may declare* a 'senior Management Distribution[.]'" (Emphasis added.)

{¶43} Although Rybak complained that there was no evidence that the Tax Cash Distributions were tied to actual payment of taxes, this was not required given the plain meaning of Main Sail's Operating Agreement, which provided that these distributions would be

> *sufficient to permit* a Member * * * to meet in a timely manner his * * * federal, state and local income tax obligations arising from ownership of a Membership interest. Distributions shall be made to the Members in accordance with their Percentages (*regardless of the Member's tax status*). (Emphasis added.)

{¶44} Main Sail therefore presented competent and credible evidence that the Tax Cash Distributions could only be given based upon the Members' actual tax liabilities. Moreover, the evidence demonstrated that the company's tax returns were not prepared at the time these distributions were determined.

{¶45} In addition, there was substantial evidence that the tax rate used to calculate the payment was appropriate and, in the years in which a Profits Bonus was declared, Rybak received 8 percent of the stated amount.

{¶46} From all of the foregoing, reasonable minds could conclude that the Tax Cash Distributions were proper and were not used to deprive Rybak of the Profits Bonus.

{¶47} In accordance with the foregoing, there is substantial evidence from which jurors could reasonably conclude that Main Sail did not breach its contractual duty to pay his target level salary, and did not improperly pay the Members Tax Cash Distributions in

order to deny him Profits Bonuses. The trial court properly denied Rybak's motions for a directed verdict and judgment notwithstanding the defense verdict.

**{¶48}** The first assignment of error is without merit.

**{¶49}** Rybak's second assignment of error states:

The trial court alternatively erred by denying Thomas Rybak's motion for a new trial on his breach of contract claim.

**{¶50}** We review a trial court's judgment on a Civ.R. 59 motion for a new trial under the abuse of discretion standard. *McWreath v. Ross*, 179 Ohio App.3d 227, 2008-Ohio-5855, 901 N.E.2d 289 (11th Dist.).

**{¶51}** Civ.R. 59(A)(6) provides that a trial court may order a new trial if it is apparent that the verdict is not sustained by the manifest weight of the evidence.

**{¶52}** In determining whether a new trial is warranted, the trial court "must weigh the evidence and pass upon the credibility of the witnesses, not in the substantially unlimited sense that such weight and credibility are passed on originally by the jury but in the more restricted sense of whether it appears to the trial court that manifest injustice has been done and that the verdict is against the manifest weight of the evidence." *Rohde v. Farmer*, 23 Ohio St.2d 82, 262 N.E.2d 685 (1970), paragraph three of the syllabus.

**{¶53}** On appeal, the appellate court must give deference to the trial court's decision because the trial judge is better situated than a reviewing court to pass on questions of witness credibility as well as the circumstances and atmosphere of the trial. *Malone v. Courtyard by Marriott L.P.*, 74 Ohio St.3d 440, 448, 659 N.E.2d 1242 (1996).

{¶54} In this matter, we find no abuse of discretion. The record reveals that the verdict was not against the manifest weight of the evidence and did not result in a manifest injustice. Although the Addendum set forth a "catch-up" provision that retroactively raised Rybak's salary to $200,000, this portion of the agreement provided that it was "Effective June 1, 2002, your compensation arrangements were restructured to provide a salary in lieu of a commission-only based program." This constitutes competent, credible evidence supporting the judgment. Moreover, Rybak received total compensation of $1,208,965 and this sum exceeds the target level compensation of $200,000 per year for the disputed period from 2002 through 2007.

{¶55} In addition, although the Addendum provided that Rybak could receive a Profits Bonus, this portion of the Addendum provided that Main Sail would review its "annual financial statements * * * [and following] such review and payment to Members of Tax Cash Distributions (if any), with respect to the Company's income during such fiscal year, the Managers of the Company *may* declare a 'senior Management Distribution[.]'" (Emphasis added.)

{¶56} No Profits Bonuses were given in 2002 or 2003, but no Tax Cash Distributions were made to the Members in those years. In 2004, Main Sail gave no Profits Bonuses, but the Tax Cash Distributions totaled $62,599, or less than 10 percent of the company's cash basis income. In 2005, Main Sail made Tax Cash Distributions of 40 percent of its cash basis income, then paid a Profits Bonus, and Rybak received $23,889.54. In 2006, Main Sail made Tax Cash Distributions of 40 percent of its cash

basis income to the Members, but it did not give Profits Bonuses due to outstanding tax obligations. In 2007, Main Sail made Tax Cash Distributions of 47 percent of its cash basis income. That year, it paid a Profits Bonus and Rybak received $86,956.56.

{¶57} The manifest weight of the evidence indicated that Tax Cash Distributions to the Members were to be given priority over any Senior Management Distribution or Profits Bonus and were properly made herein. Moreover, the evidence demonstrated that the company was not required to first demonstrate each Member's actual tax obligation, as the distributions were instead to be "*sufficient to permit* a Member * * * to meet in a timely manner his * * * federal, state and local income tax obligations arising from ownership of a Membership interest. Distributions shall be made to the Members in accordance with their Percentages (*regardless of the Member's tax status*)." Further, the record contains evidence that Main Sail used acceptable tax rates in calculating the Tax Cash Distributions.

{¶58} In accordance with all of the foregoing, the verdict is supported by the manifest weight of the evidence, and the trial court acted within its discretion in denying Rybak's motion for new trial.

{¶59} The second assignment of error is without merit.

{¶60} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY EILEEN KILBANE, JUDGE

KENNETH A. ROCCO, P.J., and
EILEEN A. GALLAGHER, J., CONCUR