[Cite as *Delta Fuels, Inc. v. DLZ Ohio, Inc.*, 2016-Ohio-970.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Delta Fuels, Inc.

    Appellee/Cross-Appellant

v.

DLZ Ohio, Inc.

    Appellant/Cross-Appellee

Court of Appeals No. L-15-1001

Trial Court No. CI0201303464

**DECISION AND JUDGMENT**

Decided: March 11, 2016

* * * * *

Daniel J. Kelly, for appellee/cross-appellant.

Thomas P. Mannion and Bradley J. Barmen, for appellant/cross-appellee.

* * * * *

**PIETRYKOWSKI, J.**

**{¶ 1}** Defendant-appellant, DLZ Ohio, Inc. ("DLZ"), appeals the May 14, 2015 judgment of the Lucas County Court of Common Pleas which, following a jury trial awarded damages to plaintiff-appellee, Delta Fuels, Inc. ("Delta"), for the negligent design of a storm sewer and relocation of a waterline in conjunction with the Maumee

River Bridge Crossing Project (the project). Delta has filed a cross-appeal challenging the trial court's denial of its motion for prejudgment interest.

{¶ 2} An overview of the facts is set forth in *Delta Fuels, Inc. v. Consol. Environmental Servs., Inc.*, 6th Dist. Lucas No. L-11-1054, 2012-Ohio-2227, 969 N.E.2d 800, and will be further elaborated herein. Since 1986, Delta owned and maintained a petroleum fuel storage facility adjacent to the Maumee River consisting of five storage tanks with two million gallons capacity each. Fuel would be piped into the facility and held in one of the tanks until moved by truck or rail. Surrounding the tanks is the secondary containment system ("SCS") which included an earthen dike approximately five feet tall, six feet wide, and twenty-five feet at its base.

{¶ 3} Interstate 280 also runs adjacent to the property. The bridge crossing the Maumee River was a lift which needed to be opened for lake freighters. In 2000, the Ohio Department of Transportation ("ODOT") announced plans for the project which centered on replacement of the bridge with a span across the river.

{¶ 4} ODOT contracted with Figg Bridge Engineers to design the new bridge. Figg subcontracted with DLZ, an engineering design firm, for the design of the sewer drains adjacent to the on and off ramps. A portion of Delta's property was taken for the project and resulted in the need to relocate a waterline. DLZ's work on the project concluded in 2002.

{¶ 5} On November 25, 2005, in the early morning after Thanksgiving, Dagen Gales was working alone at the Delta facility when a pipeline delivery, which generally

2.

lasted six to eight hours, was scheduled to be delivered. During delivery, tank 3 overflowed spilling approximately 100,000 gallons of gasoline which was not held by the SCS and migrated onto ODOT property. The abatement lasted several months with costs nearing $10 million.

{¶ 6} In 2006, Delta sued most of the parties involved in the project, including DLZ, on the theory that the ramp construction compromised the integrity of its SCS. Settlements were reached with most parties or pursued in other courts. In January 2013, Delta voluntarily dismissed the action without prejudice.

{¶ 7} On June 27, 2013, Delta commenced this refiled action against DLZ alleging negligence, or negligent design of the reconstruction of the SCS. Specifically, Delta claimed that DLZ negligently failed to perform a survey or conduct geological testing of the SCS and negligently reconstructed the SCS, negligently failed to verify the effectiveness of the SCS post-construction, failed to comply with state and federal regulations, failed to communicate and warn Delta of the condition of the SCS both prior to and following construction. Delta also alleged breach of contract as a third-party beneficiary and signatory to an access agreement. Delta claimed that the work was neither performed in a workmanlike manner nor in compliance with all applicable laws. Delta also raised nuisance and interference with groundwater claims.

{¶ 8} In its September 17, 2014 amended answer, DLZ alleged that Delta's SCS was defective and unable to contain a spill prior to the commencement of the ODOT project. DLZ denied engaging in any construction activity at or near the Delta property.

3.

Further, DLZ denied that it had any obligation to investigate the history, construction or condition of the SCS. DLZ raised several affirmative defenses including assumption of the risk, greater contributory fault, lack of privity, failure to mitigate damages, and apportionment of fault to non-parties.

{¶ 9} The matter proceeded to a jury trial on October 14, 2014. The following evidence is relevant to our analysis. On the date of the 2005 spill, Eric Troyer was employed by DLZ as a civil engineer, project manager of construction services. Troyer testified that he worked on the construction of the storm drain and relocation of the waterline for the project. Troyer stated they were given the plan of the design they were to make. Troyer had no contact with Delta during the project.

{¶ 10} Regarding the storm drain, Troyer stated that it was approximately six to ten feet deep to the Maumee River and bedded in a gravel material. As to the waterline, Troyer stated that the line replaced an old waterline and was closer to Delta's property. The center of the line was four feet from the property line with Delta and the buffer between the trench and the property line was two and one-half feet. Guidelines for the location of the waterline were given by the project managers in conjunction with the city of Toledo fire department and ODOT regulations. The line was installed to afford fire protection to Delta. Troyer stated that the fire hydrants that were placed off the line were further from Delta's property than the old line and fire hydrants.

{¶ 11} Troyer indicated that nothing in the plans raised any concern that it would impact Delta's SCS. He further admitted that there was no other place to put the line.

4.

Troyer testified that he had no idea that Delta was relying on groundwater as part of its SCS and that he had never heard of such a method.

{¶ 12} Richard Cast, Delta Toledo terminal manager until 2004, testified that he was responsible for the scheduling of incoming and outgoing product and ensuring that there was adequate tank storage. He also visually inspected the tanks for leaks and maintained the SCS by mowing the grass, removing saplings, and checking the berm for ground hog holes. Cast stated that he observed pooling of rain water in the SCS from 1992 through 1997, and 2000 to 2004.

{¶ 13} Cast acknowledged that he was not given a copy of the spill prevention and control plan when he was hired and was never provided a self-inspection and training and meeting log. Cast further agreed that there were no monthly safety meetings and that he received no training in spill prevention, safety procedures, or EPA standards. He also stated that he was the only employee at the Toledo facility. Cast stated that Delta had an environmental services company who was responsible for testing the groundwater and checking the integrity of the SCS.

{¶ 14} From 2002 through 2004, during the construction phase, Cast acknowledged that no one asked him whether he had any concerns with the SCS. Cast believed that the SCS was made of clay; he had never heard of the term "perched water." Cast admitted that on one occasion he had to cut through and repair a containment dike, and he believed the dike to be constructed only of soil. Cast further admitted that even though he was supposed to he never inspected the dike.

5.

{¶ 15} Regarding maintenance of the dike, Cast stated that when he cut trees down he would leave the stump and that there were more than fifty stumps in the dike walls. Cast further indicated that there were at least as many groundhog holes. Cast was also questioned about the Environmental Protection Agency's ("EPA") September 2003 Facility Response Plan (FRP) review which indicated that Delta was deficient in over half of the safety items reviewed.

{¶ 16} Geologist and hydrogeologist Linda Aller testified that her area of expertise is in water or liquids and how they move through the subsurface. Aller stated that in evaluating this case, she reviewed several documents provided by counsel, boring logs, and all publically available information including maps and surveys. She also conducted a 2013 site visit.

{¶ 17} Specifically, Aller stated that she reviewed 2000 and 2001 reports of environmental consultants performed prior to the start of the project. There was no evidence that any petroleum migrated to the east of the facility where the borings were located. Reports made in December 2005 and January 2006, following the spill, showed sand seams east of the site. Aller stated that the seams were discovered using a geoprobe and drilling several holes.

{¶ 18} Aller testified that liquids would flow more quickly through the sand versus soil or clay, i.e. it has a higher permeability, and that the sand seam could act like a sponge when encapsulated. Aller indicated that if the seam is cut it tends to drain. Aller specifically testified about the effects of the installation of the storm drain and the water

6.

drain on the SCS. As to the waterline, Aller stated that moving it closer to Delta's property created a drain immediately adjacent to the containment area. Aller also stated that the line cut a three and one-half foot sand seam. As to the storm sewer, Aller opined that the installation of the storm drain cut the sand seams and created an outlet for the petroleum to move through. Furthermore, the granular material around the pipe drew the liquid in and created what Aller termed a "preferential pathway," likening it to the branch of a tree.

{¶ 19} Aller also testified about the approximately 1,500 vertical wick drains that ran approximately 35 feet below the surface and aided in stabilizing the ground for constructing the ramp. Aller stated that the wick drains cut sand seams and created preferential pathways. Regarding the availability of information of the soil conditions prior to construction, Aller stated that soil surveys were done in 1943 and 1980, and that soil borings were done in 1995.

{¶ 20} During cross-examination, Aller acknowledged that she had never heard of using groundwater as part of a containment system. Aller acknowledged that from 1986, when Delta purchased the facility, through 2005, Delta did not conduct any soil borings in the SCS. She further admitted that she could not say where the gas spill would have migrated absent the ODOT construction but did claim that the construction "exacerbated" the problem. Aller could not say whether the 103,000 gallons of gas would have remained on Delta property, but she believed that absent the ground penetrations it would not have gone as far. Aller agreed that the floor of the SCS was not impermeable clay.

7.

{¶ 21} Aller was questioned regarding the placement of the new waterline versus the old waterline. She indicated that what she reviewed showed that it was located between six and eight feet closer to Delta property than the old waterline. She further agreed that DLZ designed it only four feet closer than the old waterline and that DLZ had no responsibly to direct or supervise construction.

{¶ 22} Aller acknowledged that although the ODOT construction was to the east of the facility, there was contamination found to the west. Aller further admitted that following ODOT construction but prior to the spill, there was no evidence that Delta observed any changes in the operation of the SCS.

{¶ 23} Aller was questioned about the term "perched water table" contained in her report. Aller stated that the term refers to a "zone of saturation" below the ground that exists because there is something less permeable underneath it. Aller stated that gasoline reaching the perched water table in the SCS does not mean that the SCS failed; failure would be where the gasoline migrated off site.

{¶ 24} Aller did acknowledge, however, that she did not know what the requirements of an SCS were. Notably she did not know the permeability rating required for the floor of an SCS. A discussion of permeability ratings revealed that the one to three feet of fill material was much more permeable than the clays underneath Delta's SCS.

{¶ 25} With a higher elevation, the floor was also designed to flow to the east which is where the majority of the spilled gasoline migrated. Aller clarified that the

8.

gasoline likely would have migrated off site but that the water and sewer lines permitted it to flow more quickly.

{¶ 26} Delta then offered the trial deposition of expert and civil engineer Christopher Campbell which was played for the jury. Campbell stated that for 40 years he has designed water mains and storm sewers. Campbell's involvement in the case began in 2008, when he was asked to evaluate the documents regarding the 2005 gasoline spill. In preparing a report, Campbell stated that he reviewed hundreds of documents, thousands of pages of depositions and reports, reviewed many design drawings and photographs, visited the spill site, and spoke with Delta's owner.

{¶ 27} Campbell stated that ODOT wanted the waterline relocated, so that it was not under the new entrance ramp and because the risk of a water main freeze was increased due to the proposed grade changes adjacent to the ramp. The original location was centered on a 20-foot wide easement east of Delta's property, and the new location was approximately two feet from Delta's east property line. The trench, in which the waterline sat, encroached onto the property line. Campbell further testified that the six-foot deep trench, which contained a granular backfill, combined with the sand seams that were cut created a preferential pathway for the migration of the gasoline.

{¶ 28} As to the 36-inch storm sewer line, Campbell testified that the manholes and backfill were interconnected with the waterline backfill. According to Campbell, the spilled gasoline initially followed the pathway created by the waterline and then intersected with the storm sewer backfill and ran toward the Maumee River. In addition,

9.

the construction created a draw-down of the water content in the soil and eliminated the pooling of water in the containment system which had acted as a barrier. Campbell further testified that in order to place the waterline so close to the property line, a variance was obtained from the city of Toledo.

{¶ 29} Campbell opined that due to the cut sand seams and dewatering of the containment system area, the dry sand seams acted as a "pipe" through the surrounding clay. Campbell was questioned about the foreseeability of the sand seams and the result of their being cut; he agreed that a reasonable civil engineer should have foreseen both.

{¶ 30} Campbell testified regarding the 1,500 wick drains that were installed on the ODOT property to reduce pressure due to moisture and maintain ground stability. Later, the court instructed the jury that Campbell was not an expert in wick drains and that it should consider this fact when reviewing his credibility regarding such testimony.

{¶ 31} During cross-examination, Campbell acknowledged that he had never designed a storm sewer for a road or highway project and had only been retained as an expert in roofing and building systems. Campbell further admitted that he is not an expert on how fuel moves through soil. Campbell stated that he places 100 percent of the blame for the migration of the gasoline past Delta's SCS on ODOT and its project designers.

{¶ 32} Campbell admitted that he had no evidence that the SCS held water (which he alleged acted as a barrier) other than representations made by Delta's owner and legal counsel. Campbell testified that perched water is water in the ground above the water

10.

table on top of clay or other material which aids in stopping downward migration. He admitted that the amount of perched water varies based upon rainfall and evaporation. Campbell agreed that his opinion that the cutting of the sand seam impacted the level of perched water was based on the 1986 Groundwater Technology and the 2001 Midwest Environmental reports done on the property which, he stated, averaged the perched water level at four to five feet. Campbell admitted, however, that other evidence showed the water table at 14 feet (well below the storm and sewer drain lines.) Campbell stated that the soil was markedly different where the old waterline was located and the boring was done.

{¶ 33} Campbell was questioned about the fill material that made up the first one to three feet of the SCS floor. Campbell admitted that he did not test the permeability of the fill. He agreed that it was possible that such material would not prevent spilled gasoline from seeping into the ground. Campbell also admitted that there was a dispute as to how close the relocated waterline was to the property line. Specifically, it was uncertain whether the line was two feet from the Delta's property or 4.7 feet. Campbell further agreed that DLZ had no construction supervision responsibility if the waterline was designed to be placed at four feet and the contractor installed it at two feet. Campbell still believed, however, that DLZ violated the standard of care in its design because the line was designed less than ten feet from the property line. Campbell could not point to a specific regulation mandating a ten-foot separation.

11.

{¶ 34} Campbell did not know what the groundwater level was at the time of the spill or whether it was below the sand seams and could have acted as a preferential pathway. Campbell indicated that the water contained in the sand seam, the "perched water," could also have receded due to dry weather conditions contributing to the preferential pathway.

{¶ 35} Campbell stated that in determining whether DLZ breached the standard of care he relied upon the 1986 groundwater report, the 2001 Mannik & Smith report, and the 2006 Shaw report. Campbell testified that DLZ could have acquired the former two reports although the 1986 report was not produced until 2009, and there was no evidence that the 2001 report was available to DLZ. Campbell noted that it was not "unreasonable" for DLZ "to anticipate that sand seams would occur." Campbell was further questioned:

Q: Right. In fact, no one at Delta Fuels had any idea that their secondary containment system was in any way based on perch [sic] water or sand seams until you got involved in this case, right?

A: Not until the results of the 1986 report were made available in 2009.
* * *.

Q: * * *. DLZ did not have the '86 ground water report, did not have the 2001 Midwest report and certainly did not have the 2006 Shaw report when they did their plans, you do not believe they violated the standard of care with regard to the location of the sewer line or the issues with the sand seams, right?

12.

A: Yes.

Q: Okay. So that leaves us with the location of the water line close to the toe of the dike, right?

A: Yes.

{¶ 36} Regarding the waterline, Campbell agreed that DLZ was not responsible for deciding its placement. The city of Toledo and the Toledo Fire Department were directly involved in the location of the new line. Campbell stated that the other option was to move the entire ramp further east so the line would remain in place. When questioned, Campbell agreed that Delta owner Knight was presented with the option of moving the line to the west of the facility but he refused to allow it.

{¶ 37} Following the 2005 spill and investigation, there was evidence that some of the fuel migrated to the west of the property (away from the new water/sewer line and ODOT construction.) Campbell admitted that this demonstrated a "minor" failure of the SCS system apart from any negligence of DLZ.

{¶ 38} Campbell testified that he believed that DLZ violated the engineering code of ethics. However, he could not say what degree of migration would have occurred but for the ODOT construction. Campbell admitted that Delta did not know about the sand seams or perched water until after he authored his report. Campbell also admitted that none of the geological surveys available to DLZ would have revealed the sand seams.

{¶ 39} Campbell was again questioned about his qualifications as an expert. He admitted that he is not an expert in fuel containment systems or spill migration, not an

13.

expert in roadway drainage design, and that this is the only highway project he had ever been involved with. Campbell contended that the knowledge of the dewatering effect of the storm and waterlines was within the ken of a civil engineer.

{¶ 40} John DiMartini was general manager and vice-president of Delta from 2002 to 2006. DiMartini worked at the main office for Knight Enterprises in Novi, Michigan. On the date of the spill, DiMartini arrived on site at approximately 9:30 a.m. Sometime in the afternoon he was informed that approximately 10,000 gallons spilled. DiMartini observed puddling in the dike area; there were a few large puddles of approximately 10 to 20 feet wide. An environmental clean-up company had arrived on scene with a vacuum truck. DiMartini said that he did not return to the facility because Delta's environmental consultant Steven Peach, of Consolidated Environmental Services, Inc. ("CES"), oversaw the clean-up. On the Tuesday following the Friday spill, ODOT contacted Delta to inform them that fuel had migrated onto its property.

{¶ 41} DiMartini was extensively questioned regarding the FRP plan and Delta's lack of compliance with federal regulations. In addition, DiMartini admitted that although Delta had overflow alarms at the Novi, Michigan facility, it did not at the Toledo facility. Following the spill, Delta received a letter from the United States EPA requesting information to aid in its investigation. DiMartini testified that Peach drafted the response, including the attached supporting documents, and that DiMartini signed the final copy.

14.

{¶ 42} DiMartini explained the remediation costs and testing done following the spill. He testified that Steven Peach hired Shaw Environmental which began excavating in the dike area. DiMartini stated that Shaw uncovered the old waterline that ODOT abandoned. DiMartini stated that when ODOT installed the new line which was closer to Delta's property they replaced "impermeable" clay with a sand and stone fill. DiMartini denied knowledge of Shaw's final report which stated that nothing done with regard to the ODOT construction had any effect on the failure of Delta's SCS, including the structural integrity of the dike.

{¶ 43} Finally, DiMartini was questioned about a May 2006 letter he authored and sent to the United States EPA informing them that Delta could not specify a date for the submission of the Toledo facility's FRP and Spill Prevention Control and Countermeasures (SPCC) plans. In response, the EPA found the lack of a deadline unacceptable and set it at July 31, 2006. The EPA chronicled its attempts at receiving compliant plans dating back to 2001.

{¶ 44} Delta owner Carroll Knight testified that his corporation, Knight Enterprises, purchased the Toledo facility in 1986. Knight testified that the spill resulted from a delivery from the Sunoco pipeline.

{¶ 45} Knight testified that he rejected ODOT's initial suggestion that he relocate his waterline to the west of the property because of potential expansion in that area. Knight stated that he had no idea where ODOT relocated the waterline until after the

15.

spill. Further, no ODOT representative approached him with any questions regarding Delta's containment system.

{¶ 46} During Knight's testimony an issue arose regarding the presentation of expenses specifically occurring due to remediation of the offsite migration of the fuel versus the sum total of amounts paid. Ultimately, the court permitted the testimony noting that DLZ had pretrial options to prevent the testimony including a motion to compel or motion in limine.

{¶ 47} Knight testified regarding a list of check numbers relating to the spill and remediation and compiled by the office manager. The invoices totaled $4.9 million. Knight further testified that there were settlement monies paid to the EPA for the expenses it incurred for off-site remediation. The first payment had been made with a schedule for the remaining payments which totaled $1.7 million.

{¶ 48} During cross-examination, Knight was questioned about the response time and whether CES, particularly Steven Peach, was negligent in failing to promptly determine the severity of the spill and begin clean-up. He was also questioned about the lack of an overflow alarm which he admitted he was aware of prior to the spill. Knight agreed that he knew of no safety trainings conducted at the Toledo facility.

{¶ 49} Knight testified that he knew that DLZ was not involved in the relocation and reconstruction of part of the dike. He was also questioned about a 2001 meeting with the project manager and ODOT where the plan for the access road and water and sewer

16.

lines was discussed; Knight claimed he did not recall the specifics of the meeting. Knight denied knowing that they were going to have to relocate the waterline.

{¶ 50} Knight admitted that when he purchased the property from Citgo in 1986, he had no information regarding the SCS, did not conduct any testing, and did not make any improvements. Knight was further questioned about the 1986 report prepared by John Ranks, P.E., certifying the containment volume of the tanks and SCS. Knight agreed that he commenced a lawsuit against CES for failing to properly evaluate Delta's SCS and discover the "deficiencies or infirmities in the system."

{¶ 51} Dirk Mammen, environmental consultant for Delta, testified that he was hired in July 2006, to supervise the installation of a liner system and the monitoring of the system in compliance with the EPA. Mammen testified regarding invoices related to the removal of the contaminated soil and placement of the liner system paid by Delta through 2009. He was questioned regarding on-site versus off-site expenses that were paid.

{¶ 52} At the close of Delta's case, DLZ moved for a directed verdict. As to the issue of negligence, DLZ first argued that Delta failed to define the proper standard of care for a design engineer. DLZ further contended that there was insufficient evidence presented as to negligence regarding the installation of the storm sewer, including the standard of care. DLZ stressed that the arguments relative to sand seams and perched water did not establish negligence, because even Delta had no knowledge of their potential existence until 2009. Thus, it was not foreseeable by DLZ that any design or

17.

construction could have caused any damages. Further, DLZ had no duty to Delta. Finally, DLZ contended that the damages evidence was speculative and not properly apportioned between off and on site. DLZ contended it was entitled to judgment on the issue of comparative negligence due to a noncompliant SCS and lack of employee emergency response training.

{¶ 53} In response, Delta argued that DLZ breached the standard of care by failing to consider the SCS, failure to warn of any defects it may have found, and defective design. The court denied DLZ's motion.

{¶ 54} DLZ's first witness was civil engineer Christopher Finley. Finley testified that he worked as a consultant in the environmental engineering field in remediation, treatment, and recovery systems for major oil companies. He stated that he was very familiar with the regulations regarding containment systems and spill response.

{¶ 55} Regarding containment systems, Finley testified that they are required to be "sufficiently impermeable." Finley stated that the determination is based on how long it would take to evacuate the spill and that the containment would have to hold for that long. Finley explained that the first thing is to make certain that the volume of the tank is contained within the elevation of the dike. Next, is the liner which can be made up of natural products such as clay or soil or plastic or polyurethane, and allows the product to remain above grade. Finley stated that he had never seen a facility rely solely on existing land conditions for its SCS and not add any materials.

18.

{¶ 56} In this case, Finley testified that he reviewed boxes of materials and authored a report in 2010, and an addendum in 2014. The impact of the 22 groundhogs that had burrowed and were caught immediately following the spill was discussed. The large number of trees and the impact of their roots was also discussed. Finley stated that in his opinion, Delta breached the standard of care in the fuel storage industry and environmental regulations. Specifically, although the dike walls were high enough, the floor was not sufficiently impermeable.

{¶ 57} Finley was questioned about the use of perched or entrapped water as part of an SCS. Finley stated that this water is, in fact, groundwater and a "receptor" to allow the gasoline to migrate. He indicated that if gasoline gets to the perched water table it is a failure of the SCS. Finley found nothing in his review prior to the 2005 spill indicating that Delta's SCS relied upon perched water and he had never seen perched water being used as part of an SCS. Further, as to sand seams, Finley stated that if a spill reaches a sand seam he would consider it a breach of the SCS. Finley testified that he believed that Delta's SCS "was not sufficient to maintain and recover spilled product, and it failed." Finley also believed that Delta and its agents breached the duty of care in failing to comply with federal regulations regarding its FRP and SPCC plans. Finley further opined that Dagen Gales, the Delta employee directly responsible for the spill, was not adequately trained. Following the spill, Delta failed to promptly determine the amount spilled and prevent it from migrating.

19.

{¶ 58} During his cross-examination, Finley was questioned as to whether Delta was provided with the ODOT construction plans and, specifically, the waterline plans. He answered affirmatively. Finley stated that it was not DLZ's responsibility to consider the trench's proximity to Delta's SCS but that it would have been appropriate for ODOT to notify Delta of this fact.

{¶ 59} Finley did agree that the gasoline got into the granular material of the waterline. As to the sand seams, Finley denied that an engineer should have been concerned about cutting into the seams with a waterline trench. He further stated that the seams were not continuous.

{¶ 60} DLZ's expert, hydrogeologist Farrukh Mohsen, testified next. He stated that he specializes in groundwater movement and specifically how contaminants move in the sub surface from one area to the next. Mohsen testified that it was his belief that the SCS was "designed to fail" because "it was not impervious enough to contain large volumes of liquid." Mohsen testified that he based his opinion on the hydraulic conductivity, or permeability of the soil of the SCS in relation to the viscosity of the fluid. Mohsen was questioned regarding Delta expert Chris Campbell's opinion that cut sand seams caused the gasoline to migrate along the relocated waterline. Mohsen stated that he rejected the theory because the fuel also migrated to the north and west and that the higher concentration of fuel was below the trench.

{¶ 61} During cross-examination, Mohsen stated that the gas would have "virtually" migrated in the same manner without the ODOT construction. Mohsen was

20.

also questioned about the good permeability ratings of several of the soil borings. Further, he acknowledged that the dike wall was high enough but stated that the gasoline did not go over the wall, it went through the floor. Mohsen stated that the borings he based his opinion on, with the highest concentration of gasoline, had poor permeability ratings.

{¶ 62} Mohsen did acknowledge that there were sand seams. He further agreed that the gravel surrounding the relocated waterline could act as a "preferential pathway" for the gasoline and, in fact, gasoline was found during excavation following the spill. Mohsen stated, however, that even if there was no sewer or waterline the SCS had already failed by going beyond the basin floor.

{¶ 63} Engineering geologist Dr. James Kilburg testified that in late 2005, he was employed by Shaw Environmental which was contacted by Delta's environmental consultants to, pursuant to an EPA removal order, "[i]nvestigate and ensure the structural stability of Tank # 3 and Tank # 4, the secondary containment dike system, the Enbridge pipeline the State of Ohio waterline, and the State of Ohio storm sewer system. By 3/31/06."

{¶ 64} Kilburg testified that in evaluating the SCS, he first went and walked the site. Looking at the "health" of the containment system, Kilburg stated that he observed vegetation and animal burrows within the containment cells. Testing began in January 2006, and Kilburg stated that the permeability results indicated that the SCS did not have the ability to retain liquids.

21.

{¶ 65} Kilburg testified that he submitted the report to the EPA on March 31, 2006. Kilburg specifically found that the soils and permeability were "variable" and that, in part, caused the SCS to fail. Kilburg stated that ODOT did a "very good job" at reconstructing the part of the dike system its work impacted and that the SCS would have failed even if the work had never been done.

{¶ 66} Bradley Walker, safety specialist for HNTB, contract manager for the project, testified that on Tuesday, November 29, 2005, he was on site and noticed that the fuel spill had migrated to the ODOT construction site. He informed Delta of the spill but testified that there was a "lack of concern" on Delta's part. Walker ultimately contacted the EPA regarding the spill.

{¶ 67} Civil and geotechnical engineer Stephen Pasternack, vice-president of BBC & M, Inc., an environmental consulting firm, testified that he was hired by DLZ to review the allegations against it. Pasternack disagreed with the expert opinion of Christopher Campbell and stated that his opinion was that DLZ did not violate the standard of care for an engineer performing its contract with Figg, subcontractor of ODOT, or any duty to investigate the conditions of Delta's SCS. Specifically, Pasternack testified that "it isn't the role of civil engineers within this context to evaluate off property structures with regard to whether or not they meet code and whether or not they will operate properly."

{¶ 68} Pasternack was questioned extensively about the sand seam or seams within the SCS. He agreed that the seam would be more pervious than clay. He

22.

disagreed that a seam filled with water would prevent additional liquid from entering. Pasternack was also questioned about the dewatering of clay and acknowledged that when it lowers in moisture content, fractures can occur and that liquid can move through fractured clay.

{¶ 69} At the close of all the evidence the motion for directed verdict was renewed and denied. Following deliberations and the completion of the interrogatories and verdict forms, the jury found that DLZ had a duty of care to Delta and that it breached its duty of care. The jury further found that DLZ's breach was the proximate cause of Delta's damages. In addition, the jury found that CES and/or Steven Peach breached a duty of care to Delta and that such breach proximately caused Delta's damages. The jury then determined that Delta, under a respondeat superior theory, was responsible for CES's breach and causation. The jury then apportioned the negligence as 60 percent attributable to DLZ and 40 percent attributable to Delta. They then awarded Delta $2.1 million in damages. Final judgment was entered in the amount of $1,260,000, or 60 percent of the total verdict.

{¶ 70} On November 12, 2014, DLZ filed a motion for set-off of the jury verdict based upon Delta's settlement with CES. Similarly, on December 15, 2014, DLZ filed a Civ.R. 60(B)(5) motion to vacate the jury verdict. DLZ argued that under R.C. 2307.28, CES and Delta's 2010 settlement in the amount of $2,757,000 completely offset the jury's verdict.

23.

**{¶ 71}** On December 30, 2014, DLZ filed a motion for judgment notwithstanding the verdict ("JNOV") and/or a new trial. DLZ argued that the claimed damages were not foreseeable and that Delta failed to establish causation or damages. Specifically, DLZ argues that Delta failed to provide sufficient evidence of the standard of care and that DLZ breached the standard, failed to provide proof of damages attributable to DLZ, and that the negligence attributable to Delta was more than 50 percent.

**{¶ 72}** On May 14, 2015, the trial court denied DLZ's post-trial motions. As to the motion to reconsider or vacate the verdict, the trial court denied the motion finding that it was "illogical" because DLZ sought to vacate the judgment while at the same time using the judgment to set-off the amount based upon the settlement between Delta and CES.

**{¶ 73}** As to the JNOV motion, the court simply stated that it found that "sufficient, competent evidence was presented for the jury to consider in reaching the verdict." As to the motion for a new trial under Civ.R. 59, the court found that there was no evidence of passion or prejudice which would have influenced the jury's verdict. The court further concluded that the verdict did not represent a manifest injustice. The court also rejected the argument that the verdict was contrary to law as precluded by the economic loss doctrine. Finally, the court denied DLZ's motion for set-off finding that the jury imputed CES' negligence to Delta and, thus, it was incorporated in the 60/40 apportionment of negligence. This appeal followed.

24.

**{¶ 74}** DLZ now raises the following four assignments of error:

1.) The trial court erred when it entered judgment on the jury's verdict inconsistent with its October 1, 2010 judgment entry in the prior proceeding approving plaintiff-appellee Delta Fuels, Inc.'s ("Delta") prior settlement with former co-defendant Consolidated Environmental Services ("CES") and stating that R.C. 2307.28 would apply to reduce the amount of Delta Fuels' claim against all non-settling defendant, including defendant-appellant DLZ Ohio, Inc. ("DLZ") by the amount of the settlement, resulting in an impermissible double recovery for Delta.

2.) The trial court erred in denying DLZ's post-trial motion for set-off when the jury determined that CES was a joint tortfeasor whose negligence was a proximate cause of the damages claimed by Delta, and whose prior voluntary settlement with Delta exceeded the total amount of damages awarded by the jury resulting in an improper double recovery for Delta.

3.) The trial court erred in denying DLZ's motions for directed verdict and for judgment notwithstanding the verdict because Delta failed to establish the essential elements of its negligence claims against DLZ by a preponderance of the evidence.

4.) The trial court erred in denying DLZ's motion for a new trial when the judgment was not sustained by the weight of the evidence and was contrary to law.

{¶ 75} Delta raises the following assignment of error in its cross-appeal:

I. The trial court erred by denying plaintiff's motion for prejudgment interest.

{¶ 76} We will first address DLZ's third and fourth assignments of error as they are related and dispositive. In its third assignment of error, DLZ contends that the trial court erred in denying its directed verdict and JNOV motions because Delta failed to establish DLZ's negligence by a preponderance of the evidence.

{¶ 77} Our review of the grant or denial of a motion for directed verdict or a motion for judgment notwithstanding the verdict is de novo. *Kanjuka v. MetroHealth Med. Ctr.*, 151 Ohio App.3d 183, 2002-Ohio-6803, 783 N.E.2d 920, ¶ 14 (8th Dist.); *Grau v. Kleinschmidt*, 31 Ohio St.3d 84, 90, 509 N.E.2d 399 (1987).

{¶ 78} Civ.R. 50 sets forth the standards for granting a motion for a directed verdict and a motion for judgment notwithstanding the verdict and provides, in part:

(A)(4) When a motion for directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

* * *

(B) Whether or not a motion to direct a verdict has been made or overruled * * * a party may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion; or if a verdict was not returned, such party, * * * may move for judgment in accordance with his motion.  A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative.

{¶ 79} Conversely, an appellate court reviews a court's ruling on a motion for a new trial under an abuse of discretion standard.  *Harris v. Mt. Sinai Med. Ctr.*, 116 Ohio St.3d 139, 2007-Ohio-5587, 876 N.E.2d 1201, ¶ 35; *Sharp v. Norfolk & W. Ry. Co.*, 72 Ohio St.3d 307, 312, 649 N.E.2d 1219 (1995).  That is, we will not reverse the court's decision unless it is arbitrary, unconscionable, or unreasonable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).  Civ.R. 59(A)(6) provides that a new trial may be granted where "[t]he judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case[.]"

{¶ 80} DLZ's argument as to the court's denial of its motion for directed verdict/JNOV centers around the foreseeability of the damages alleged by and awarded to Delta.  DLZ contends it had no actual or constructive notice that Delta's SCS relied upon perched water.  DLZ further asserts that Delta acknowledged this fact.  DLZ argues that Delta failed to establish the standard of care that it alleged was breached by DLZ's engineers.

{¶ 81} To establish actionable negligence, it is axiomatic that one shows the existence of a duty. *Mussivand v. David*, 45 Ohio St.3d 314, 318, 544 N.E.2d 265 (1989). In Ohio, "[t]he existence of a duty depends on the foreseeability of the injury. The test for foreseeability is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act." (Citations omitted.) *Estates of Morgan v. Fairfield Family Counseling Ctr.*, 77 Ohio St.3d 284, 293, 673 N.E.2d 1311 (1997).

{¶ 82} Construing the evidence in Delta's favor, we note that its expert, Campbell, testified that he based his opinions regarding the cut sand seams allowing the water and fuel to escape the SCS on reports that were either not conducted until after the spill or not available to DLZ when it designed the waterline. In fact, during Campbell's testimony the following exchange took place:

Q: It is reasonable to assume that a secondary containment system housing 11 million gallons approximately of highly volatile gas and fuel oil would base its secondary containment system on sand seams and perched water?

A: I don't believe that they based it on sand seams and perched water.

Q: Right. In fact, no one at Delta Fuels had any idea that their secondary containment system was in any way based on perch[ed] water or sand seams until you got involved in this case, right?

28.

A: Not until the results of the 1986 report were made available in 2009.

{¶ 83} Further, Campbell questioned about prior deposition testimony as follows:

Q: "Question, geological, there are plenty of geological explorations all around the Delta Fuels site, right?" Answer, "there are." Question, "did any of those geological explorations that were available to DLZ show what you are saying would be discovered by geological exploration?" Your answer, "The reports I saw out in the ramp X area would not, they did not call out sand seams so they wouldn't have picked up from that." Did I read that correctly?

A: I believe you did.

{¶ 84} Additionally, although DLZ's own geological assessment revealed the existence of sand seams, it showed them to be variable, and not continuous. The soil borings revealed no indication that any of the work being done had any impact on the Delta site.

{¶ 85} Finally in addition to lack of foreseeability, there was no substantial, competent evidence presented establishing a causal connection between the relocation of the waterline and the migration of the spilled fuel. There was testimony presented regarding the creation of a "preferential pathway by construction of the waterline;" however, Delta expert Linda Aller could not say whether it impacted the amount of fuel that migrated off Delta property.

29.

**{¶ 86}** We note that a jury may not reach a verdict based on speculation. *Ohio Bell Tel. Co. v. Columbus*, 10th Dist. Franklin No. 09AP-113, 2009-Ohio-5126, ¶ 17, citing *Westinghouse Elec. Corp. v. Dolly Madison Leasing & Furniture Corp.*, 42 Ohio St.2d 122, 326 N.E.2d 651 (1975). Accordingly, we find that the evidence was not sufficient to allow a jury to determine whether DLZ was negligent in its design of the water or sewer lines.

**{¶ 87}** Under DLZ's fourth assignment of error, we also find that the verdict was against the weight of the evidence. As stated above, Delta failed to prove that its perched water cut sand seams fuel-migration theory was foreseeable or that DLZ breached a duty of care.

**{¶ 88}** Based on the foregoing, we find that the jury's verdict against DLZ was not supported by sufficient evidence and was against the weight of the evidence. DLZ's third and fourth assignments of error are well-taken.

**{¶ 89}** Based on our disposition of DLZ's third and fourth assignments of error, we find its first and second assignments of error are moot. We further find that Delta's cross-assignment of error is moot and not well-taken.

**{¶ 90}** On consideration whereof, we find that substantial justice was not done the .party complaining and the judgment of the Lucas County Court of Common Pleas is reversed. We remand the matter for the court to enter judgment in favor of DLZ. Pursuant to App.R. 24, appellee Delta is ordered to pay the costs of this appeal.

Judgment reversed.

30.

Delta Fuels, Inc.
v. DLZ Ohio, Inc.
C.A. No. L-15-1001

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.          _____

                                                    JUDGE

Arlene Singer, J.         

                                        _____

James D. Jensen, P.J.                                 JUDGE
CONCUR.

                                        _____

                                                    JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.